O. J. McMANUS v. CHICAGO GREAT WESTERN RAILWAY Co., Appellant.

**Carriers:** AUTHORITY OF AGENTS: PRESUMPTION: PROOF OF AUTHORITY: I EVIDENCE. It will be presumed that a railway agent has no authority to act in the matter of making shipments from stations other than the one at which he is employed, and this is true with respect to his authority concerning shipments beyond the terminus of the road; but such authority may be shown by proof of other like acts of authority, or by the acceptance or approval of like services by his principal. The evidence in this case of the agent's authority to negotiate for shipment from another station is held sufficient to take the question to the jury,

but not sufficient to show authority to make contracts of shipment beyond the line of the company by which he was employed.

**Same:**  DECLARATIONS OF AGENT.  The declarations of an agent are not competent on the question of his authority to bind the carrier for shipments beyond its lines, unless his acts in so doing have been ratified or confirmed by carrying the same into effect.

**Contracts:**  VARIANCE BY PAROL.  Evidence that the shipping rates were not to be inserted in the contracts of shipment, and that no rates were in fact inserted when the contracts were signed, but that they were made out simply as evidence to the conductor of the right to transportation with the shipment, was not objectionable as tending to vary or contradict the terms of the instruments; but was admissible to show what the contracts in fact were when signed.

**Carriers:**  DELAY IN TRANSPORTATION: EVIDENCE.  In this action for delay in transportation the evidence is held to warrant a finding that defendant was responsible for a delay of several hours, between the point of shipment and the yards where the stock was unloaded for feed and rest.

**Same.**  In an action for negligent delay in the shipment of stock, evidence of the length of time required to ship stock between two other points further separated than those in question, and on another line of road, was inadmissible, but in view of the record in this case its admission was not prejudicial.

**Evidence of value:**  ADMISSIBILITY: IRRESPONSIVE ANSWER: OBJECTION.  The inquiry of a witness, if he knew the value of cattle in Canada during a certain month, was objectionable for indefiniteness; but as it was merely preliminary, calling for a fact touching his competency, its admission was not erroneous. And although the answer was not responsive opposing counsel could not raise that objection.

**Evidence:**  OFFER OF EXHIBITS: REVIEW OF RULING.  Where portions of a letter were offered in evidence and were excluded upon objection that the entire letter was not offered, and subsequently the introduction of the entire letter by the other party was permitted, the appellate court was not in position to pass on the ruling, in the absence of a showing in the record of the omitted portions when first offered, or to determine whether the party offering only portions was in position to object to the entire offer.

**Evidence:**  MOTION TO STRIKE: REVIEW.  A motion to strike certain

8   evidence from the record, which had not been ruled upon by the trial court, will not be reviewed on appeal.

**Carriers:** NEGLIGENT DELAY IN TRANSPORTATION: MEASURE OF DAMAGES.
9   Where a carrier contracts to transport stock to the terminus of its line, with the understanding that it is to be taken by other companies and transported in the same cars to its destination, the measure of damages for negligent delay by the initial carrier is the difference in the value of the stock in the condition in which it was in fact delivered, and its value had it been delivered within a reasonable time, at the point of destination.

**Carriers:** INTERSTATE COMMERCE RATES.  Rates for the interstate trans-
10   portation of freight, which as fixed by the carrier's agent are inconsistent with the schedules filed with the Interstate Commerce Commission, are invalid.

**Same:** CONNECTING LINES: EXCESSIVE CHARGES: RECOVERY OF SAME.
11   Where the interstate charges on freight were paid by each succeeding carrier to its predecessor up to its own line, and the terminal carrier collected all the freight from the shipper for the entire distince at its termination, and it was not shown that any part of an overchange ever reached the initial carrier, the intial carrier was not liable for any part thereof.

*Appeal from Superior Courl of Council Bluffs.*—Hon. S. B. Snyder, Judge.

Monday, June 10, 1912.

Action to recover alleged excessive charges, damages to stock shipped, and loss of time resulted in a verdict for the plaintiff, and judgment was entered thereon.  The defendant appeals.—*Affirmed on Condition.*

*Carr, Carr & Evans,* and *Saunders & Stuart,* for appellant.

*Kimball & Peterson,* for appellee.

Ladd, J.—The facts are quite fully stated in the opinion filed on the former appeal, 138 Iowa, 150.  Upon

remand to the district court, amendments to the pleadings were filed, and, though other claims were pleaded, only those for overcharge of freight, injury to stock while in transit over defendant's line, and loss of time by plaintiff's assignors were submitted to the jury. It will be recalled that on the 29th day of April, 1904, three brothers named Baker shipped three car loads of stock and other property from McClelland, Iowa, to High River, Alberta, via the Chicago & Great Western Railway Company, the Minneapolis, St. Paul, & Sault Ste. Marie Railway Company, and the Canadian Pacific Railway Company. The property to be transported was loaded in cars of the Canadian Pacific Railway Company and delivered by the defendant at the Minnesota Transfer, near Minneapolis, Minn., and from there hauled by the Minneapolis, St. Paul & Sault Ste. Marie Railway Company to North Portal, N. D., from which point the Canadian Pacific Ry. Co. took them to High River, Alberta.

The Bakers assigned their claims against the defendant to O. J. McManus, who brought this action. McManus, acting for them, had negotiated with one Shipley, as agent of the defendant at Council Bluffs, Iowa, for the transportation of these cars, though there was a local agent at McClelland, who signed the shipping contracts. The defendant maintained an uptown office at the Grand Hotel in Council Bluffs, bearing Shipley's name, followed by "City Passenger and Freight Agent," and to him McManus applied and was informed the rate would be twenty cents per 100 pounds from McClelland to the Minnesota Transfer, minimum weight of 20,000 pounds per car, and $45 per car from there to High River, Alberta, on a minimum weight of 24,000 pounds per car, and, after several conversations, Shipley said he would furnish Canadian Pacific cars, and later informed McManus that he had gotten two stock cars and one box car in which the property could

*1. CARRIERS: authority of agents: presumption: proof of authority: evidence.*

be shipped through to its destination.    These cars were sent from Council Bluffs to McClelland, loaded April 29, 1904, and carried the property to its destination.    Appellant contends that the evidence was insufficient to support a finding that Shipley was authorized to act for it in negotiating shipments from McClelland or beyond its line of road.    Presumably an agent of a railroad company is without authority to act for it in the matter of shipping from stations other than that at which he is employed. *Voorhees v. Railway*, 71 Iowa, 735; *Burgher v. Railway*, 105 Iowa, 336.    And this is true with respect to authority concerning shipments beyond the terminus of the road. *McLagan v. Railway*, 116 Iowa, 183; *McManus v. Railway*, 138 Iowa, 150.

. But an agent may be shown to possess authority, and evidence tending so to show may be by proof of other like course of dealing or of the acceptance or approval of like services by the principal.    "The course of dealing between the parties through the alleged agent is generally relevant and admissible upon the question of agency and its extent. . . .    The accepted acts of an agent are always evidence to show the extent of his powers."    *Blowers v. Railway*, 74 S. C. 221 (54 S. E. 368); *McCormick v. Lambert*, 120 Iowa, 181; *Grant v. Humerick*, 123 Iowa, 571; Greenleaf on Evidence, par. 64 et seq.

The evidence bearing on Shipley's authority to negotiate shipments from McClelland was such as to leave little doubt as to its existence.    At least, it was sufficient to carry that issue to the jury.    An examination of the record, however, has not disclosed evidence sufficient to sustain a finding that he also had authority to contract with respect to shipments beyond defendant's lines of railroad.    McManus testified concerning a shipment made by a nephew of the Bakers in the fall of 1903, and that:

The Great Western Railway maintained an office in the Grand Hotel on Pearl Street, and one on Main street

in Council Bluffs, in 1903, 1904, and 1905. The Main street office was the depot. The agent was Ed Shipley. I have seen him at those offices and have had conversations with him. The name of the company was on the Grand Hotel office with the name of Shipley, city passenger and freight agent. The Bakers made a shipment from McClelland, Iowa, to High River, in the fall of 1903. Written contracts were made with the Great Western for the shipment from McClelland, Iowa, to Minnesota Transfer, and other contracts with the Soo were made covering the shipment from Minnesota Transfer to North Portal, and at that place other contracts with the Canadian Pacific were made covering the shipment from North Portal to High River. I saw the goods loaded at McClelland and saw them afterwards at High River. I did not have any talk with Mr. Lively, the agent at McClelland, in reference to where they were to go. I had a conversation at Council Bluffs with Mr. Shipley in regard to the shipment of some household goods, stock, and implements, and other emigrant movables of the Bakers from McClelland, Iowa, to High River, Canada, during the fall of 1903. It was at the Grand Hotel city office. I went there to ascertain the rate on a car of emigrant movables from Council Bluffs to High River. At that time I did not know where the car would be loaded. Mr. Shipley, in charge of the office of the Chicago Great Western Railway, quoted the same rate I had received from the agents of other roads I had interviewed. That rate was twenty cents per 100 from Council Bluffs or McClelland to the Minnesota Transfer, a minimum weight car of 20,000 pounds. From the Minnesota Transfer to High River, Alberta, a lump rate of $45 per car with a minimum weight of 24,000 pounds. I explained to Mr. Shipley that the emigrant movables would consist of farm implements, some household furniture, and stock. In accordance with this conversation, a car was furnished at McClelland, Iowa, for this shipment. Shipley said the Great Western Railway Company would furnish cars for the shipment of goods from McClelland, Iowa, to High River, Canada, in the fall of 1903. He said they would furnish large furniture cars, or they would have the Canadian Pacific cars come down here to be loaded. At that time, I had not decided whether to load at McClelland or

Council Bluffs; but in either case he said he would furnish the cars. He said afterwards it would make no difference whether they furnished furniture cars or Canadian Pacific cars; they could be sent through to High River without unloading. He said they would be so sent. I afterwards told him we had decided to load at McClelland, Iowa, because it was more convenient, and the rate was the same, and it was immaterial to me who furnished the cars, provided they could make a through shipment. He said, in either case, it would be a through shipment, and that the company would furnish the cars. I then went out to McClelland the day he said the cars would be there. It was the next day after our last conversation. Mr. Shipley was at McClelland, and I talked with him there about taking a car that was then loaded with lumber. We unloaded the lumber and used the car the next day for loading. Mr. Shipley went inside the building when he was out there this time at McClelland. . . . At the time I did not know the station agent at McClelland, but I think he was inside with Mr. Shipley at the time he gave these instructions. . . . I saw the goods afterwards which were loaded upon that car at High River. At the time I had this talk with Mr. Shipley and further shipment of these goods from McClelland, Iowa, to High River in the fall of 1903, he said it was necessary to have a bill of lading made out upon which one would ride. He told me they would have new bills of lading on the Soo line and on the Canadian Pacific. He told me the rate for through shipment from McClelland to High River would be twenty cents per 100 to the Minnesota Transfer on a minimum of 20,000 pounds to the car and $45 per car from there to High River, Alberta, making a total of $85. Mr. Shipley said the payment would be $85 per car, providing it did not weigh more than 20,000 pounds. That carload in 1903 went out over the Great Western Railway. I had a conversation with Mr. Shipley in regard to making shipments of three cars in the spring of 1904. I told him I would want three cars for the shipment of goods to the same place where we shipped the car last fall. We would ship from Council Bluffs or McClelland or from Neola, if we shipped by way of the Milwaukee, all of which had given us the same rate. I saw him again, and he said, 'I have given

you two stock cars and one box car for the shipment.' I said, 'I am glad of that.' It would make it more convenient for them to live in a box car and put the stock in the two cars. Q. You may state what, if anything, was said to you about joint through rates in this connection. A. He stated it was a joint through rate. Q. What, if anything, did you say about it differing from the combined rates over the connecting lines? A. He said it was a lower rate than the combined rate or sum of the rates of the defendant carriers. I asked him in reference to the 1904 shipment, if it would make any difference if there would be more than ten head in each car, and he said it wouldn't, provided the weight does not exceed 20,000 pounds. All the cars contained some emigrant movables, but one car contained no stock. . . . I did not see Shipley at the time the 1904 shipment was loaded. We were not able to find the bills of lading of the original shipment in the fall of 1903. Mr. Shipley, with whom I had the talk about the through rate from McClelland to High River, Canada, on the shipment of the goods, was the same Mr. Shipley from whom I obtained the cars. . . . There was no arrangements made with either of the connecting lines for the transportation of these cars, except the arrangements I made with Mr. Shipley for a through shipment. Mr. Shipley said bills of lading would be made out for the person that accompanied the car. He said, about making a through shipment in the spring of 1904, that the shipment would be sent through the same as the previous car in the fall of 1903. I have negotiated for others and made a large number of shipments from McClelland and the vicinity of Council Bluffs to High River, Canada. McClelland is the second station out from Council Bluffs.

Of course, the declarations or statements of Shipley are not to be considered in determining whether he had authority to contract for defendant concerning shipments beyond its lines, save in so far as these were ratified or confirmed by the defendant in carrying them out. Undoubtedly, the car furnished by defendant was hauled to its destination; but this was done precisely as though he had said nothing

2. SAME: declarations of agent.

concerning a through shipment or rates.   The goods with the six head of stock did go through in the same car, but there is nothing in this record to indicate that this was not the ordinary and usual method of transportation, in the absence of any arrangement therefor.   Though Shipley may have said reduced rates were being named, the evidence is conclusive that those 'named by him were the freight tariffs as appear in the schedules filed with the Interstate Commerce Commission of the United States; that of defendant being that named by Shipley, and the joint rate of the other two companies being $43.50 per car.   The excess stated by Shipley of $1.50 per car may have been switching charges at the Minnesota Transfer, though it is not explained.   Moreover, shipping contracts were executed with each of the connecting lines, and, as the shipper accompanied the car, even the duty of forwarding does not appear to have been performed by defendant.   As said, transportation of the car in 1903 was effected precisely as though there had been no preliminary arrangement for a through shipment at a specified price, and, this being so, what was done did not tend to ratify or confirm anything Shipley had undertaken beyond defendant's railroad, and therefore was not evidence that he was authorized by defendant to contract concerning transportation over connecting lines. Though we doubt whether he undertook to do more than inform plaintiff of the freight charges over the railroads from the Minnesota Transfer to High River, the manner of transportation over the several lines, and to furnish cars in which the shipper's property might be carried to their destination, it is unnecessary to so decide, as the court should not have submitted the issue as to whether he was authorized to negotiate shipments beyond defendant's road to the jury. See *Hill v. Railway,* 60 Iowa, 196; 6 Cyc. 482.

II.   Shipping contracts were signed by the Bakers and also by the agent at McClelland.   In these contracts as introduced in evidence, the rate of freight appears to have

been inserted.   McManus testified that, under his arrange-
ment with Shipley no rate was to be in-
serted in the contracts; that these were to
be made out merely as evidence to the con-
ductor of the right of the person accompanying the car
to transportation.   And he and two others testified that
the rate had not been inserted when the shipping contracts
for carriage over defendant's line were signed.   This testi-
mony was objected to on the ground that it tended to vary
the terms of a written instrument.   The objection was
rightly overruled, for the purport of the testimony was not
to vary or contradict these contracts, but to prove what
they were when signed by the parties.

3. CONTRACTS:
variance
by parol.

III.   Cattle were loaded by the Bakers in two of the
cars, twenty-nine head in one and twenty-two head in the
other, and a part of their other property in each of these,
and the rest in the box car which they
rode.   These left McClelland April 29, 1904,
and did not reach the Minnesota Transfer,
a distance of three hundred and ninety miles, until May
3d.   In the meantime the cattle had not been unloaded.
Edwin T. Baker, as witness, was asked:

4. CARRIERS:
delay in
transportation:
evidence.

When you came to Minnesota Transfer, where were
the cars left first?   A. They were left on the Soo line.
Before that they were in the yards.   Q. How soon after
your arrival at Minnesota Transfer were you put down to
the chute?   How long a time elapsed before you were put
down to the chute?   A. Five or six hours.   The chutes
were out a quarter of a mile from where we pulled in at.
We pulled in at the Transfer yards from the general yards.
That is what is known as the Minnesota Transfer.   The
Transfer engine belonged to the yards pulled us down to
the chutes.   The cars were not all taken down together.
Q. Well, did the Great Western Railway Company deliver
your cars to a place after you arrived at the Transfer where
you could feed and water?   A. After five or six hours—
after we had been there five or six hours.   These yards
were built off from the Transfer yards.

We have recited this evidence as the best answer to appellant's contention that it was in no wise responsible for the delay of the five or six hours mentioned. Precisely when the cars were turned over to the Minnesota Transfer Company is not disclosed by the record, and the jury might have found that this did not happen until the cars were hauled to the chute by its engine.

IV. Edward T. Baker was asked the usual time for shipping a car of stock from McClelland to the Minnesota Transfer, and answered, "About forty-eight hours," and that the distance was 390 miles. He also said that it was about 480 or 490 miles from Neola to Chicago, and that he knew how long it took to ship cattle between these points. "Q. You may state how long it takes to ship cattle from Neola to Chicago." Over objection, he answered, "About twenty-four hours." Neola is not on the defendant's line, and just why this evidence was received is not clear. It should have been excluded as having no bearing whatever on the issue.

5. SAME.

But damages were claimed only for delay above the usual time in going from McClelland to the Minnesota Transfer, and no other evidence of the usual time required to transport freight between these places was adduced except that of McManus, who fixed the time at from twenty-four to thirty-six hours. As the cars were on the road two days longer than the highest estimate, and the condition of the cattle after starting was not shown save upon their arrival at the Minnesota Transfer, we are of opinion that the error in permitting the witness to state the usual period of hauling freight from Neola to Chicago was without prejudice.

V. E. G. Baker testified at a former trial, but had died since, and the transcript of his testimony was read to the jury. He had been a farmer and shipper of stock for many years, and was asked: "Did you know about what milch cows were worth on the market in Canada, in May,

1904?" This was objected to as "incompetent, irrelevant,
and immaterial," and the answer as not re-
sponsive. "A. They were pricing milch
cows there at $50 per head." The objection
might well have been sustained owing to
the indefiniteness of locality; but the question was merely
preliminary, calling for knowledge which tended to estab-
lish the competency of the witness, and viewed in this light,
the ruling ought not to be denounced as erroneous.

    The answer was not responsive, but this was not an
objection counsel on the other side might urge. Had it
been objected to on other grounds, a different question would
have been presented. There was no error.

    VI. Upon the arrival at his destination, E. J. Baker
addressed a letter to McManus, dated June 17, 1904. De-
fendant offered portions of it in evidence. The plaintiff
objected on the ground that the entire letter
was not introduced. The objection was sus-
tained. Shortly afterwards, the plaintiff of-
fered the entire letter, and the defendant's
objection thereto, as incompetent, irrelevant, and immaterial
and having no bearing on the issues, was overruled. As the
record does not disclose the portions omitted by the defend-
ant and included by plaintiff, we are unable to pass on the
ruling, or to say whether defendant, after tendering most of
it, was in a situation to complain of the introduction of
the entire letter.

    VII. Edwin T. Baker was examined as to the value
of the cattle at the Minnesota Transfer; but after stating
that they were of the market value of $1,000, and would
have been worth $1,500 had they been hauled
to that place, in the usual time required, on
cross and redirect examinations, appeared to
have known nothing of the market values at that point.
Afterwards, defendant moved to strike out this evidence,
but the court remarked, "I will not rule on this at present,"

*Margin notes:*

6. Evidence of value: admissibility; irresponsive answer: objection.

7. Evidence: offer of exhibits: review of ruling.

8. Evidence: motion to strike: review.

and the matter was not referred to again. Of course, the motion should have been sustained; but counsel do not appear to have insisted upon a ruling, and error can not be predicated on a motion in the absence of any ruling thereon. It is to be said, however, that, as the measure of damages as defined in the instructions did not involve the market values at the Minnesota Transfer, the ruling, if made, could not have been of much significance, and this doubtless accounts for counsel not having insisted thereon.

VIII. Edwin T. Baker testified that the value of the cattle at High River, Alberta, if they had been transported, without delay, would have been $1,500, and that in the con-

9. CARRIERS: negligent delay in transportation: measure of damages.

dition they were due to the delay and injury from delay which occurred upon the Chicago Great Western Railway they were worth $1,000, and the court instructed the jury that:

The proper measure of plaintiff's damage is the difference, if any, in the reasonable market value of the cattle on the market at High River, Canada, at the time they should have reached their destination, in the condition they would have been had they been transported to such destination within a reasonable time; and the reasonable market value of the cattle at High River, Canada, in the condition in which you in fact find they would have been delivered to their destination, taking into consideration only the injury to said cattle, if any, due to unreasonable delay upon the line of the defendant, the Chicago Great Western Railway Company, from McClelland, Iowa, to Minnesota Transfer, Minn., together with interest on such difference, if any you find, from the 18th day of May, 1904.

Appellant urges that, inasmuch as it was to carry the cattle to the Minnesota Transfer, the true measure of damages would be the difference between the market values of the cattle at that place as they were and would have been but for the unreasonable delay on its road. Even though defendant might not have been heard to object if

such measure had been applied, we are not ready to criticise that given. It is undisputed that defendant undertook to haul the cars to the Minnesota Transfer with the understanding that these would be taken by other companies to their destination, and, as the cars were to go through, any detriment to the shippers due to injuries to the property being transported would result at the destination, and it may well be assumed that this was within the contemplation of the parties. The situation is analogous with contracting for shipment with reference to a special market. Defendant arranged to haul the cars in view of their being taken on to a particular, locality, and, if because of its delay or other fault the property was injured, the damage to the shipper was at that locality, and the carriage must have been undertaken with this understanding. If so, the measure of damages, as defined in the quoted instruction, was correct, and there was no error.

IX. According to McManus' testimony, Shipley named a freight charge from McClelland to the Minnesota Transfer of twenty cents per 100 pounds or $40 per car carrying not exceeding 20,000 pounds, and a flat charge from the Minnesota Transfer to their destination of $45 per car carrying not exceding 24,000 pounds. With the consent of Shipley, as well as the agent at McClelland, the Bakers loaded twenty-nine head of cattle in one stock car and twenty-two head in another, reserving the box car in which to place most of their furniture and implements, though some were placed in each of the other cars. The rates of transportation as thus fixed were not valid if inconsistent with tariff schedules filed with the Interstate Commerce Commission. *Kansas City Southern Ry. Co. v. C. H. Albers Com. Co.*, 223 U. S. 573 (32 Sup. Ct. 316, 56 L. Ed.—). Defendant introduced in evidence certified copies of tariffs filed by it with the Interstate Commerce Commission from which it appeared that the rate fixed for the trans-

10. CARRIERS: interstate commerce rates.

portation of emigrant movables from McClelland to the Minnesota Transfer was twenty cents per 100 pounds and for cattle 23½ cents per 100 pounds in car load lots. It also introduced in evidence certified copies of the special joint freight tariffs of the Minneapolis, St. Paul & Sault Ste. Marie Railway Company and the Canadian Pacific Railway Company from which it appeared that from the Minnesota Transfer to High River, Alberta, the freight on settler's effects was $43.50 per car of 24,000 pounds. A car load of settler's effects might not contain to exceed ten head of cattle; but if more were included, on these last roads, "the additional animals will be charged for at proportionate rates over and above the car load rate for settler's effects; but the total charge for any such car will not exceed the regular rate for a straight car load of live stock."

There is nothing before us indicating the rates of transportation on stock beyond the Minnesota Transfer. If there was any rule as to freight charges on excess of live stock in cars shipped as emigrants' movables over defendant's line, this is not disclosed in the record. Was additional freight to be exacted on the stock in excess of ten head per car or on the cars at live stock rates? If the latter is the rule, but $14 more might have been charged for hauling the cars to the Minnesota Transfer, and less than this if additional freight were to be exacted on part only. No freight charges were paid in advance. Each succeeding carrier advanced to its predecessor the charges up to reaching its line so that the Canadian Pacific Railway Company collected all transportation charges at High River, Alberta, upon the delivery of the property at that point. The sum of $255.98 more than $85 per car was exacted. On what ground this apparent extortion may be justified or explained we are not advised. It is enough now to say that there was no showing of what, if any, part of this reached the

11. Same: connecting lines: excessive charges: recovery of same.

defendant, and, this being so, there is no ground for recovery of the excess freight charge from it.

If plaintiff cares to file a remittitur of $255.98 with interest at six percent per annum from May 18, 1904, the judgment as thus modified will be affirmed.    Otherwise, reversed.—*Affirmed on Condition.*