WILLIAM SIDNEY BISSELL, Appellant, v. MIKE SPRING et al., Appellees.

ALICE B. LYSTER, Appellant, v. H. J. TATGE, Appellee.

**PRINCIPAL AND AGENT:** Powers of Agent—Authority to Receive
1 Payment. *Possession* of negotiable paper is by no means the

only legal evidence of authority to receive payment. Authority on the part of one to receive payment on behalf of a creditor may be established by conduct. Evidence reviewed, and held sufficient to show that the long continued course of business between a bank and the holder of mortgage securities armed the bank with authority to receive payment without the production of the notes, etc.

**PRINCIPAL AND AGENT:** Mutual Rights, Duties, etc.—Subagent Placing Collections to Credit of Agent. It is immaterial that a subagent, who had authority from a general and unlimited agent to receive payment of negotiable mortgage securities belonging to the principal, placed collections to the credit of the general agent instead of to the credit of the principal.

*Appeal from Adams District Court.*—H. K. Evans, Judge.

SATURDAY, APRIL 7, 1917.

THESE two cases were brought in equity to foreclose mortgages on real estate. By agreement, the two cases were tried together in the district court, and are so presented here. The defendants alleged payment to the First National Bank of Corning, Iowa, which defendants allege was the agent for plaintiff, and also pleaded by way of estoppel that plaintiff could not now claim that the bank did not have authority to receive payment. There was a decree for defendants in both cases. Plaintiffs appeal.—*Affirmed.*

*A. Ray Maxwell,* for appellants.

*Meyerhoff & Gibson,* for appellees.

PRESTON, J.—There is no dispute on the

1. PRINCIPAL AND AGENT: powers of agent: authority to receive payment.

part of the plaintiffs, and no claim on the part of the bank that it did not receive the money, and that, if the payments were authorized, the notes and mortgages of the defendants are fully paid. The securities were not in the possession of the bank, but were in possession of the agent of plaintiffs at the time the payments were made by de-

fendants. The securities were by their terms payable at this bank. It is appellants' contention that the bank was the agent of the defendants, while defendants claim that the bank was agent for plaintiffs.

The plaintiff Bissell is the son of John H. Bissell, and plaintiff Lyster is the daughter of said John H. It is conceded that John H. had full authority and power to act for plaintiffs in these matters and that he was agent for them, together with other persons for whom he had dealings and loaned money, and that he was acting for plaintiffs in the matter of the loans in the two instant cases. Because John H. Bissell conducted the business for plaintiffs, we may, for convenience, refer to him as plaintiff, in some instances.

There seems to be but little dispute between counsel on questions of law, so that the question in the case is one of fact as to whether or not the bank had authority and was in fact the agent of plaintiff; or, if not, did he so conduct himself and the business between himself and the bank and defendants in these cases as to justify defendants in making payment to the bank of the amounts paid by them? If either of these propositions is found for defendants, then the decrees of the district court should be affirmed. The number of witnesses testifying is not large, and yet there were hundreds of letters produced, and a large number of them introduced in evidence, making a long record. Both parties concede that payment to a person other than the person having possession of the note and mortgage is not good unless the person making the payment prove by a preponderance of the evidence that the person to whom the payment was made was the agent and had authority. Defendants assumed the burden of proof, and sought to show, by the circumstances and the weight of the evidence, that the bank was authorized to receive payment. There can be no question, we think, that the defendants, in making payments, acted in good faith and with reasonable dili-

gence. A brief history of the matter at this time may be helpful.

In the first case, *Bissell v. Spring,* defendants executed a mortgage to John H. Bissell, February 12, 1912, for $2,-800, due March 1, 1917. This indebtedness was assigned by John H. Bissell to appellant William Sidney Bissell, June 20, 1912. The note contained a provision by which the makers could pay $100, or any multiple thereof, on any interest payment day after one year. Attached to the note as originally executed were 10 interest coupons. Said defendants paid $877 in February, 1913, $755, August 25, 1913, and $1,375 in February, 1914. All of said payments were made to the bank before named, and receipts were taken therefor. Said sums were placed to the credit of John H. Bissell at said bank, and of the second payment, a part was used in payment of an overdraft of Mr. Bissell's account. There is a dispute between counsel as to whether a general account with the bank was authorized by Bissell, defendants claiming that he had knowledge thereof and authorized it. Plaintiffs concede that temporary deposits were authorized until the money should be remitted or needed in making other loans, and the like.

In the Lyster case, defendant executed his mortgage bond for $1,800, February 20, 1904, with interest, all payable at the bank before named, with option to pay $100 or any multiple thereof at any interest payment date. $600 of this loan had been paid prior to March 20, 1909, on which date, John H. Bissell executed a written extension agreement, whereby $1,200 of said indebtedness was extended until March 1, 1914, and the rate of interest changed, and to which were attached 5 interest coupons. On August 14, 1913, this bond and mortgage were assigned in writing to appellant Lyster. Appellant concedes that $1,200 of the principal and all interest had been paid up to and includ-

ing March 1, 1913, leaving a balance of $600. Appellee paid to the bank $630 in full on March 4, 1914.

John H. Bissell was a resident of Detroit, Michigan. He had been engaged in the business of making farm loans in Adams County, first through the Darrow Investment Company, of Corning, from about 1896 until about January 1, 1909, when that company was dissolved, and thereafter, the bank before named handled the loan business and the collection of loans for him and his customers and clients until the bank was closed by the comptroller on May 15, 1914. Mr. Bissell seems to be a man of business capacity and large experience, and the business referred to involved the handling of large sums of money, and loans were made to a large number of people. The Darrow concern was a loan company, and was operated in connection with the bank, or as a branch of it, from 1896 until its business was wound up, the officers of the two institutions being substantially the same. A Mr. Runyan was with the Darrow Company in the management of the loan business during practically all this time, and after the business was transferred to the First National Bank, he had charge of the loan business. He was an officer of the bank, and was vice president at the time of the transactions involved in this case. Runyan died in April, 1914.

We shall first state the substance of appellants' claim as to what the record shows, then set out enough of the testimony to show wherein some of their claims are not established by the testimony. It should be stated first, though, that, as to some of the facts, there is no dispute at all. It is claimed by appellants that, in the conduct of the business by John H. Bissell, the borrower would make a written application for the loan, pay the loan company, or loan department, a commission for its service and all expenses in connection with the preparation of the papers, continuation and examination of abstract of title, record-

ing, etc. The company, or loan department, would then, either by correspondence or printed lists, advise its investor customers of such loans, offering them for sale; that the notes and mortgages were payable at the bank, and the company and loan department performed all the duties with reference to the notice to borrowers of interest due, collection and remittance of principal and interest, recording of releases, assignments, etc., without charge to the investors; that the company and loan department, at their expense, in the first instance, had examinations made of the title, that they might loan the money and sell the securities; that plaintiff, being in possession of the securities as purchaser or trustee, would, from time to time, send to the bank the interest coupons or securities, prior to their maturity, for collection, and the bank would thereupon notify the debtor, and, when payments were made, remit to plaintiff, unless there were special instructions to the contrary. It is claimed by appellants that, at different times, plaintiff instructed the loan company and the loan department of the bank as to the manner in which he desired the business conducted. It is true that there is running through his letters to the bank and Mr. Runyan, the man in charge of the loan department of the company, and the Darrow Company, when it was in existence, that which indicates that he was not intending that they should represent him as agent, and yet, through all these letters and the account which was carried at the bank, it is evident that, while he was pretending not to make them his agent, yet he was in fact relying upon them as his representatives, trusting them to make his loans, deferring to their judgment in the matter of security, allowing them to approve or reject all abstracts of title, permitting them and authorizing them to advance money for him when they did not have the funds on hand; and that he authorized them to transfer money from one loan, when paid in, to a new loan which

was being negotiated, and permitted them in a great many ways to act in his behalf and interest in conducting his business. The loan company and the bank seem to have been faithful in accounting for all funds until soon before the bank failed.

It is doubtless true that Mr. Bissell transacted the business, in part, at least, as claimed by plaintiffs, but he seems to have departed from the custom, or at least it was not always done that way. There were a great many transactions which were not handled in the method claimed.

It is not our custom to attempt to set out in detail the evidence in these fact cases, for reasons which are obvious. We shall not refer to all the evidence and the circumstances, or attempt to state all the conflicting claims and statements of the different witnesses, or attempt to reconcile them and determine where the preponderance lies as to each particular circumstance. We shall refer to the evidence in a general way, and our conclusion is that, from the entire record, the findings of the trial court were right, and in accordance with the law and the testimony.

The following cases may be cited as sustaining the proposition that possession of negotiable paper is not the only legal evidence of the authority to receive payment. *Townsend v. Studer,* 109 Iowa 103; *Campbell v. Gowans,* (Utah) 23 L. R. A. (N. S.) 414, 415, and note; *Harrison v. Legore,* 109 Iowa 618; *McLean v. Ficke,* 94 Iowa 283; *Security Co. v. Richardson,* 33 Fed. 16.

That the agency may be established from the conduct and relations of the parties and the surrounding circumstances, without showing express authority, see *Grant v. Humerick,* 123 Iowa 571; *McManus v. Chicago G. W. R. Co.,* 156 Iowa 359; and *Campbell v. Gowans,* 23 L. R. A. (N. S.) 414, supra. We do not understand appellants to controvert these legal propositions. We shall now refer as briefly as may be to some of the circumstances which we think show

authority on the part of the bank to receive money from the defendants.

In many cases, Mr. Bissell, when placing the loans in Adams County, would send the money to the bank, which would then close the loan, complete the papers and forward them to him; he did not see the papers until after they had been prepared and the money paid out to the debtor. In the Spring loan involved in this case, it was paid off by credit and by forwarding cash prior to March 1, 1912, and the loan papers were not forwarded to Mr. Bissell until June 19, 1912.

We may as well here refer to some of the other circumstances in regard to the loans in the two cases in controversy. Under date of January 2, 1912, plaintiff wrote the bank as follows:

"I will leave the matter of the amount and the nature or the value of the security to your best judgment. I cannot from your statement very well pass on the value of that, but am quite willing to abide by your judgment. I have no doubt they are quite responsible men, and will leave it entirely to you as to both questions."

February 13, 1912, the bank wrote plaintiff in regard to this same loan as follows:

"In the matter of the Spring Bros.' loan, these young men came to us a few days ago and wanted us to make them the entire $2,800 on the 104 acres of land last proposed by them as security. * * * We said, however, that we would make them a loan for you on either of two plans— a loan of $2,200 at 5 per cent interest, or a loan of $2,800 at 5½ per cent enterest, the security in either case to the 104 acres above referred to. They have decided they will pay you the increased ½ per cent and will take the entire loan for $2,800. * * * The papers in the case have been sent for their signature, and the loan will be closed at as

early a time as possible. When it is closed, we will send you the papers."

In answer to this letter, plaintiff wrote the bank on February 15th as follows:

"Referring to the loan * * * Spring Bros. I am perfectly satisfied with your arrangement you make on loan in form reported, and shall be glad to have the papers as soon as convenient."

It could not be claimed, it seems to us, that the bank was acting as Mr. Spring's agent, for the bank states in the letter that they are making the loan for plaintiff. The evidence shows a large number of other similar transactions. Similar letters were written to the bank by plaintiff in regard to other loans at about the same time and for a considerable period before, and in some of them, plaintiff authorized extensions of loans, if, in the judgment of the bank, the security was in good shape, and the length of time to which loans were extended was also left to the bank. The coupon notes on the loans involved in this case were sent to the bank for collection on interest pay days; and, at the time of paying such coupons, when the coupons were in possession of the bank and paid and surrendered by it, defendants made payments on the principal and a receipt was given by the bank for the payment on principal. There can be no question that the bank had authority to collect the interest payment, for they had the original coupons in their possession, and the defendants had the right to pay $100, or any multiple, at any interest pay day. As stated, the mortgage and note in the instant case provide for payment at the bank, which was known to plaintiff. It is not claimed by appellees that this of itself authorized payment on the principal to the bank without the bank's having possession. In both cases at bar, plaintiff had received partial payments on the principal, which had been paid at the bank. Plaintiff himself testifies:

"It was my invariable custom, in dealing with the bank, to receive payments at any time when the money was forwarded to me, and if it was a partial payment, I sent a special receipt, and if the mortgage was paid in full, when I would receive the money I would send all the papers, with the release, to the bank."

Mr. Newcomb was cashier of this bank from 1910 to the time it failed, and testifies:

"We exercised the authority of collecting interest and principal, and held ourselves out to the public as having authority from Bissell. I would say that we represented that we had authority to collect partial payments of interest, as well as principal, for customers, and it was the general custom of the bank to receive them and of borrowers to pay them."

Defendants in both cases said that they relied upon the fact that the bank held itself out as having authority to collect and exercised the right to collect for plaintiff, not only in these particular loans, but in other loans. The Tatge loan was given some years before Mr. Bissell purchased it.

Going back now to some of the circumstances in regard to the manner of the conduct of the business, and as indicating that the bank was the agent for plaintiff, who permitted the bank to accumulate payments on his loans and use the money in making new loans, plaintiff himself testifies:

"Between 1904 and 1912, on several occasions, I was advised by the bank that a number of securities would be paid in about the first of March, and when I had notice from the bank, as I did several times, that mortgages would be so paid, the bank submitted to me other applications for loans, which, when accepted, I directed the bank to pay for the new loans out of the principal paid in on others."

But he claims that, on each of these occasions, there

was a special authorization to apply in that manner the money so paid. We think the record shows that this was not the case in a number of instances. After the failure of the bank, plaintiff wrote the receiver, saying that, on several occasions, he authorized the bank to take the money paid on a loan to make a new one. In September, 1910, plaintiff wrote the bank:

"If the Brennan money is paid in, take the S. B. Shaw loan in my name as executor. * * * Any payments made in besides the Brennan, please remit, and, on my return, I will advise about new investments."

The bank attended to all the recording, preparation of papers and other ministerial duties connected with plaintiff's loans. This circumstance would not be as strong, perhaps, if the bank was only making loans for itself in the first place and selling them to investors. As stated, plaintiff's claim is that this was the method. But, as shown, there are many instances in plaintiff's dealings where such is not the case. And so, as to the payment of taxes by the bank, it is shown that the bank attended to seeing that the taxes were paid on the lands mortgaged, and would, if necessary, bid in such lands at tax sale. Appellants' claim as to the taxes is that this was done for the borrower, to the end that his mortgage should be a first lien. Appellants also claim that, while plaintiff did not see the lands offered as security, he relied upon the applications presented, and the representations of the bank with reference thereto. But, as already shown, in many instances, plaintiff relied upon the judgment of the bank. The bank would and did, in numerous instances, advance money for plaintiff and carried loans for him until money had been paid in on his account at the bank, or he should send money to cover the same. The bank collected the interest and principal of plaintiff's many loans, and this was done both with and without the possession of the security, and this was ap-

proved by plaintiff. Without referring to the numerous let-
ters bearing on this question, we may cite one or two, and
some of them bearing directly upon the two loans in ques-
tion. On February 10, 1913, plaintiff wrote the bank:

"I have your letter of the 7th enclosing exchange on
New York for $200 upon the principal of the H. J. Tatge
mortgage. On referring to the papers I find that the orig-
inal note   *   *   * was given for $1,800, but there is
endorsed on it a payment of $100 March 1, 1907, and an-
other payment of March 1, 1909, $500. That makes the
principal $1,200 and is just what it was when I purchased
the mortgage from you in 1909 for this Soverhill estate.
Since that time, I find on my ledger a payment of $400
March 1, 1912. That may have been $300, 1911, and $100,
March, 1912.   *   *   * The payment of a year ago reduced
the principal to $800, and this payment of $200 reduced it
to $600."

That the security in this instance was not in possession
of the bank at the time some of these payments were made,
appears from the testimony of plaintiff himself, who says:

"The Tatge mortgage was the property of the Soverhill
estate.   *   *   * As executor of that estate, I had in my
possession said mortgage from the time of its purchase
from the First National Bank of Corning, Iowa, in March,
1909."

In this same connection, reference may be made to the
circumstances in regard to the payment of $800 on the prin-
cipal of the Spring mortgage to the bank, tending to show
that the bank not only had authority to collect the money,
but that such authority was recognized by plaintiff. March
5, 1913, the bank wrote plaintiff:

"There has been paid to us on the Spring loan $800 on
account of the principal. We have held this item over un-
til the press of business of March 1st was past, and would

be pleased of your instructions as to whom we shall send draft for this item."

In answer to this, two days later, plaintiff wrote the bank:

"Please forward the $800 payment of the Spring Bros. loan, as I have occasion to use at once."

March 11, 1913, the bank wrote plaintiff and enclosed draft for this $800. At the time of this payment, the security was in the possession of plaintiff, and not the bank, so that it would seem that plaintiff knew of the payment on the principal, and that he thereafter approved of such payment. Correspondence between plaintiff and the bank in regard to numerous other loans shows that the business was done in the same manner. In some instances, plaintiff urged the bank to greater diligence in making collections. January 12, 1912, he wrote:

"What is the matter with the Cora L. Shafer mortgage? I have had no interest during the past year. The last payment was made December 3, 1910. I wish you would look it up and let me know if foreclosure is necessary. I can send on the papers."

Again, on March 23, 1909, plaintiff wrote the bank:

"I enclose with this, for collection, the following coupons. * * * Bell, no coupon, $15. Can we not have the Bell mortgage, belonging to my daughter, either paid or extended? If the security is good and the risk not impaired, we shall be glad to have a renewal for two or three years, if that meets with your approval; otherwise we should like to have it paid."

And again, February 20, 1912:

"I send you for collection the following coupons: * * * W. R. Miller, $60 * * * C. A. Miller, $115. Has not part of the principal, $100 at least, been paid on this?"

December 31, 1913, the bank wrote plaintiff:

"Mr. J. L. Moore, whose loan of $500 held by Mrs.

Lyster falls due tomorrow, has today elected to pay off the loan. We have taken the liberty to credit the $500 to your account, awaiting your instructions as to remittance or disposition of the fund."

In answer thereto, plaintiff wrote the bank on January 3, 1914:

"Your letter of December 31 is received in regard to the payment of the J. L. Moore mortgage held by Mrs. Lyster. I now enclose all papers  *   *   *  with release  *   *   * and request that the $500 be remitted at once."

This shows that the money was credited to plaintiff's account, and that payment was made without the bank's having possession of the securities, and such is the situation in numerous other instances. March 5, 1913, plaintiff wrote the bank:

"I also acknowledge receipt of the draft for $3,164.50, covering the interest and principal on the Evans loan. Herewith is release  *   *   *  note and mortgage."

June 1, 1912, the bank wrote plaintiff in regard to another loan:

"We have received payment of the Jackson loan due today.  *   *   *  We have taken the liberty to credit the $2,000 to your account, pending your instructions in the matter. Should you desire this remitted you to avoid confusion of accounts, we will gladly send it forward. We enclose release, which please have executed as soon as convenient, and return to us with the papers."

We shall not take the time to refer to the numerous other similar instances. We have not attempted to set out any considerable part of the record. We may have set out more than is necessary. But it is quite clear to us that the defendants have made out their defense of payment, and that the payment to the bank was authorized. This is decisive of the case, and we do not feel justified in extending the opinion to notice the question of estoppel. Much

of the testimony already set out would have a bearing upon that question.

2. PRINCIPAL AND AGENT: mutual rights, duties, etc.: subagent placing collections to credit of agent.

There is one other point that should be referred to briefly. Some of the money paid by Tatge was deposited to the account of John H. Bissell, and not to his daughter, Mrs. Lyster. But, as before stated, it was conceded that Bissell was acting for his daughter, and if it be true, as we find, that the bank had authority to receive payment of this money, the fact that it was placed to the credit of Mr. Bissell rather than Mrs. Lyster, after the collection,—or even if the bank had failed to account at all, —would not change the situation.

The opinion is long enough, and, without further discussion, it is our conclusion that the decrees of the district court were right, and they are in both cases—*Affirmed.*

GAYNOR, C. J., LADD and EVANS, JJ., concur.