Isabella McCullough, Appellee, v. W. A. Reynolds, Appellee, et al., Appellants.

PRINCIPAL AND AGENT: Powers of Agent—Evidence—Course of
1   Conduct. *Possession* of an instrument is by no means the only evidence of authority to receive payment thereon. When a principal, by his habits and course of dealing, has held out an agent as having general authority to make loans for him and to receive payments on same, he may be bound by payments to the agent *although the securities are not in the possession of the latter.*

PRINCIPAL AND AGENT:   Powers of Agent—Payments to Agent
2   —Embezzlement, etc.—Effect. If an agent has express or implied authority to receive payments on behalf of his principal, it is quite immaterial to the one making payment that the agent embezzled the money paid, or otherwise committed crime with reference thereto.

*Appeal from Linn District Court.*—John T. Moffit, Judge.

DECEMBER 10, 1917.

Suit in equity for the foreclosure of a mortgage. The defendant pleaded payment of the mortgage debt. Decree for plaintiff, and the defendants Prymek appeal.—*Reversed.*

*Joseph Mekota* and *C. F. Clark,* for appellants.

*Redmond & Stewart,* for appellee.

Weaver, J.—It is not material in this
statement to recite the facts attending the
making of the mortgage in suit. It is suffi-
cient that the mortgage debt was contracted
in the name of the defendant Reynolds, and
that, at the date of the mortgage, he held the title to the real
estate in question. Afterward, the property was sold and
conveyed to the defendant William Prymek, and in that
transaction and in part consideration of said conveyance
to him, he paid or attempted to pay the mortgage debt. In
pursuance of that purpose, he went to a firm known as
Miles & Son, who, he was informed and believed, were the
authorized agents of the mortgagee, and paid to them the
full amount of the debt, principal and interest, and said
agents furnished to him an instrument purporting to be ex-
ecuted by the mortgagee, acknowledging full payment of
the mortgage debt and discharging the mortgage lien. That
this was done in good faith by Prymek, and in full faith
that Miles & Son were authorized to receive such payment
and that the release given him was a genuine instrument,
there is no question. The mortgagee denies, however, that
Miles & Son were authorized to act as plaintiff's agents in
such matter or to receive payment of the debt, and alleges
that she has never received any part of such payment or
ratified the acts of her alleged agents in receiving it. She
also denies the genuineness of the release furnished the ap-
pellant, and avers that it is a forgery.

This statement indicates with sufficient clearness the
paramount question in the case: Was the appellant justi-
fied in making payment to Miles, or Miles & Son, as the
agents of plaintiff to receive it? Or, stated otherwise, were
Miles & Son the agents of the plaintiff to make this collec-
tion; and if not, had plaintiff, by her acts, words or conduct,
so clothed them with apparent authority to represent her

1. Principal and
Agent:
powers of
agent: evi-
dence: course
of conduct.

that appellant, as a reasonably prudent man, was justified in making payment to them?

The testimony is very voluminous, and includes a large number of exhibits which cannot be here set out at large. Without quotation of the language of witnesses, save in a few instances, by way of illustration, we shall confine ourselves to a general statement of the ultimate facts as they appear to be established by the evidence as a whole.

J. M. Miles, who was the plaintiff's distant relative, had for many years conducted a loan agency business in Cedar Rapids. He died in December, 1911. A few years prior to his death, he associated with him in such agency his son, Matt J. Miles; and thereafter the business was conducted in the firm name of Miles & Son. After the death of the father, the son continued the business for some time. Plaintiff lived in Wisconsin, and, so far as shown, never visited Cedar Rapids at any time during the period hereinafter mentioned. She was one of a family of eight or more brothers and sisters, all of whom had money which they desired to invest in loans. Beginning in 1911 and continuing down to the summer of the year 1914, Miles and Miles & Son made many loans for the plaintiff, aggregating about $30,000, and for the McCullough brothers and sisters, an aggregate of over $200,000. Among the loans made for the plaintiff was the one to the defendant Reynolds, for $2,200, secured by mortgage upon Cedar Rapids real estate. The note and mortgage representing this loan are the instruments sued upon in this action. The note bears date May 1, 1911, and is made payable 5 years after date, at the office of J. M. Miles & Son, with interest at 6 per cent, payable annually. It also reserves to the maker the right to pay $10 or any multiple thereof upon the principal sum on interest pay days. The mortgage, in addition to the usual terms of such instruments, provides that, if the mortgagor should make any change in the ownership of the

property without giving written notice thereof to the mortgagee, it should constitute a default by the mortgagor in the terms of the contract, for which the mortgage might be at once foreclosed. When the appellant Prymek proposed to purchase the land, the abstract of title exhibited to him was submitted for examination to his counsel, who pointed out the necessity of removing the Reynolds mortgage. The attorney thus consulted was a resident of Cedar Rapids, and knew that Miles & Son had been doing a large business in loaning and collecting moneys for the McCulloughs. He told the appellant that the money was payable at the office of Miles & Son, and advised him to go there and pay off the lien and have a release made and shown in the abstract. Following this advice, the money was paid to Miles & Son, who delivered to the appellant a release of the mortgage, regular in form, purporting to be executed by the plaintiff and acknowledged before M. J. Miles, Notary Public. Appellant asked the alleged agents for the note which he had paid off, but was told that, the instrument having been given by Reynolds, he was the one entitled to receive it. Thereafter, no demand was made upon appellant or Reynolds by or for the plaintiff until May, 1914, when she caused written notice to be given that she still held the note unpaid, and that no one except herself or her counsel was authorized to collect it. Concerning the general course of business between plaintiff and Miles & Son, there is very little dispute. While the plaintiff swears broadly, "J. M. Miles & Son did not act as my agents in any capacity in connection with this loan, and they had no authority to collect interest," it is very evident, from her own testimony elsewhere, and from the overwhelming weight of the testimony, that J. M. Miles and Miles & Son had been, for at least twelve years, acting as her agents in some capacity with reference to each and every one of the numerous loans made by them on her account. It is also quite

evident that this agency was of a more intimate and informal character than usually exists between nonresident money lenders and the local agents through whom they do business.   It was not the custom of the Miles agency to send plaintiff any formal applications from proposed borrowers for approval; the services of no appraisers were required by her; the abstracts of title were not forwarded to her for inspection; all notes, both principal and interest, were made payable at the Miles office; all payments of principal and interest on the entire list of loans were in fact made at that office; such payments were at times made before they were due, and plaintiff would afterward forward the proper receipts or the canceled securities for delivery to the makers; and, though plaintiff herself was never in Cedar Rapids, it was her uniform practice to sign the releases of mortgages prepared for her by Miles & Son and send them back for either J. M. or Matt J. Miles to attach his notarial certificate, to the effect that she had personally appeared before him and acknowledged the execution of the instrument.   Perhaps no more satisfactory light can be thrown upon the manner and nature of these transactions than is furnished by the following extract from the plaintiff's cross-examination.   Being interrogated by counsel for defendant, she testified:

"Q.   And they collected all the interest, did they not—that is, J. M. Miles, or J. M. Miles & Son?   A.   Yes.   Q. They collected all the principal, did they not, when it was due, or sometimes before it was due?   A.   Yes.   Q.   And they made renewals of these mortgages?   That is, if the note and mortgage were not paid when due, would they make a renewal of it—extend the time?   A.   Yes.   Q.   And they did look after the insurance for you, did they not, on the property—see that the property was insured?   A. Yes.   Q.   And they would look after the appraisement or the value of the property?   That is, you would accept or

would take their judgment in that respect as to the value of the property on which the loans were made? A. Yes. Q. And would also rely on them to examine the title; that is, if the title was sufficient or clear, or that the title was right, that the owner or borrower had in the property? A. Yes. Q. You considered Mr. Miles or J. M. Miles & Son as your general agent in charge of making these loans in the state of Iowa, or in the vicinity of Cedar Rapids, did you not? A. No, I didn't consider him as the agent. Q. You did all these things through him that I mentioned, did you not? A. Yes. Q. Well, what would you call that? You considered him during all this time as your general agent in making and attending to matters that I have mentioned heretofore? A. Yes. Q. It is true, is it not, that J. M. Miles or J. M. Miles & Son had general charge as your agent of all these loan matters and everything necessary to be done to properly secure, protect and collect the money loaned? (Question objected to as to form and for calling for conclusion, and because it embodies several questions in one, and witness refuses to answer the question in that form on advice of counsel.) Q. You knew all this time that the borrowers were in the habit of dealing with J. M. Miles or J. M. Miles & Son directly in all these matters pertaining to those loans from the year 1898 to the end of the year 1912-1913? A. I suppose they did; I don't know. All the money I ever got from these loans from 1898 to 1912 came through J. M. Miles or J. M. Miles & Son. I do not know any of the addresses of the borrowers nor had any correspondence with them."

For these varied services in her behalf, plaintiff paid Miles & Son one per cent on the amounts loaned. Indeed, it would seem that the only function which the plaintiff reserved to herself was to furnish the money, when she had it, to supply the call for loans, and that every other matter and thing connected therewith, the approval of the borrower

as a safe or desirable person to deal with, the approval of
the security offered, the sufficiency of the title to the prop-
erty, the receipts of payments of both principal and inter-
est, whether before or after due, and the renewal or exten-
sion of loans, were left solely and entirely to the care and
discretion of Miles, or Miles & Son.    She at no time rejected
any loan he or they negotiated, nor, until about the time this
action was begun, did she ever disapprove of his or their
management of her business.    Indeed, she concedes that,
even after she claims to have discovered that Miles had with-
held collections made for her, she continued to do business
through him.    She further says she never at any time knew
the address of any of the borrowers.    Moreover, it appears
that mention of her place of residence was uniformly left
out of the mortgages, releases and other papers connected
with the loan, to avoid revealing her whereabouts to the
assessor and taxing authorities.    It was to this end also
that, whenever any paper executed by her was of a kind to
require acknowledgment, such acknowledgment was un-
truthfully certified to have been made in Cedar Rapids.    The
very extensive correspondence between the parties is in en-
tire accordance with the tenor of plaintiff's statements, as
above quoted.

There is much more in the record having a tendency to
bear out the defendants' theory of the case, and we have
little hesitation in saying that, upon the plaintiff's showing
alone, the authority of Miles & Son to receive payment from
appellant is sufficiently established.    On much less persua-
sive proof we held that the agent's authority to collect was
sufficiently shown in *Harrison v. Legore,* 109 Iowa 618;
*Townsend v. Studer,* 109 Iowa 103; *Bissell v. Spring,*
179 Iowa 1005.

But counsel argue that Miles & Son were not professing
to act as agents for plaintiff in receiving the money, and
that in truth it was paid to them merely as part of the pur-

chase price of the land, and not as payment of the mortgage debt. But the record does not bear out this claim. It is true that Matt J. Miles appears to have had some sort of interest as agent for the sale of the land to Prymek, but it does not appear that Prymek paid him the purchase price as agent of the seller and trusted him to clear the title by getting the mortgage released. It is shown, and without dispute, that, when the examination of the abstract of title disclosed the mortgage, Prymek was informed by his legal adviser of the necessity of paying it off, and was directed to Miles & Son as the agents of the mortgagee to whom to make such payment, and that he acted upon that advice. We cannot presume that he would have paid the money just the same had he not learned of their agency. There is nothing in this phase of the case to take it out of the rule of our precedents above cited.

Considerable attention is paid in argu-
2. PRINCIPAL AND
AGENT: powers
of agent: pay-
ments to
agent: em-
bezzlement,
etc.: effect.
ment to the claim of plaintiff that the release of the mortgage was a forgery, which appellee charges to have been perpetrated by Matt J. Miles. It is not necessary to the disposition of this appeal that we undertake to determine the truth of this claim. It is proper to say that Mr. Miles flatly denies the charge, and it is to be said in his behalf that the otherwise suspicious circumstance that the certificate of acknowledgment of the release is certified by him as a notary at Cedar Rapids loses much of its force when it is shown that such improper certification was, for more than ten years, the uniform and constant practice between plaintiff and her agents, even with respect to papers the genuineness of which is not questioned. But even if Miles & Son, or either of them, having collected the money, embezzled it and sought to conceal the offense or postpone its discovery by forgery of the release, it in no manner weakens or avoids the defense pleaded, if it be

fairly established, as we hold, that they had authority to receive the money. It should also be said that the death of J. M. Miles took place shortly after the payment of this money and the delivery of the release, and we are deprived of the assistance which his testimony would have afforded in arriving at the truth of these matters.

Again, we are cited to a class of cases in which it has been held that payment of a promissory note to an alleged agent who is not at the time in possession of the paper is made at the debtor's risk, and, if it appear that the alleged agent did not in fact have such authority, the payment to him will be no defense to an action brought by the holder of the note. That this is a correct general rule, applicable in all cases which show no other material facts than those indicated in such statement, we may admit; but it certainly is not a rule which governs all cases where payment is made to an agent or alleged agent not in possession of the instrument. The sufficiency of such payment will be sustained where the conduct of the holder of the note or his manner of doing business has been such as to fairly indicate the authority of the agent to receive payment, or to induce the debtor to believe that he has such authority. Such was our holding in the *Harrison-Legore* case, and in the *Bissell-Spring* case, supra. Indeed, an inflexible, cast-iron rule which would disregard all payments made under such circumstances would be grossly unjust, and open a wide door to fraud and oppression. Supporting this view see *Campbell v. Gowans,* 35 Utah 268; *Thomson v. Shelton,* 49 Neb. 644; *Union Trust Co. v. McKeon,* 76 Conn. 508; *General Convention v. Torkelson,* 73 Minn. 401; *Church Assn. v. Walton,* 114 Mich. 677; *Reid v. Kellogg,* 8 S. D. 596; *Fitzgerald v. Beckwith,* 182 Mass. 177; *Doyle v. Corey,* 170 Mass. 337; *Quinn v. Dresbach,* 75 Calif. 159; *Security Co. v. Richardson,* 33 Fed. 16; *Noble v. Nugent,* 89 Ill. 522; *Doe v. Callow,* 64 Kans. 886; *May v. Jarvis-Conklin Mtg.*

*Tr. Co.*, 138 Mo. 275; *Johnston v. Milwaukee & Wyo. Inv. Co.*, 46 Neb. 480. To hold that plaintiff can carry on a business of this kind through a long series of years, giving the public and those with whom her agents deal every apparent reason for believing that they are her authorized representatives, and then repudiate their authority when, as she claims, she finds they have abused her confidence, would be very inequitable. It is an old and recognized rule in equity that, where one of two innocent parties must suffer by the wrong or default of a third person, the loss should be borne by the one who put it in the power of the wrongdoer to inflict the injury.

The judgment of the trial court must be reversed, and the plaintiff's bill dismissed.—*Reversed.*

GAYNOR, C. J., PRESTON and STEVENS, JJ., concur.