BURLINGTON SAVINGS BANK, Appellee, v. PRUDENTIAL INSURANCE COMPANY OF AMERICA, Appellant, et al., Appellees.

APRIL 3, 1928.

REHEARING DENIED SEPTEMBER 28, 1928.

476

*Stout, Rose, Wells & Martin* and *P. W. Harding*, for appellant.

*Sims & Page* and *Tinley, Mitchell, Ross & Mitchell*, for plaintiff.

*P. J. Klinker* and *L. W. Powers*, for George Argotsinger and Rose Argotsinger, appellees.

*Andrew Bell*, for Jacob Johnson, Trustee in Bankruptcy, appellee.

*J. E. Shaw Van*, for Charles L. Voss, appellee.

*L. W. Powers*, for W. M. Knutson, receiver, appellee.

MORLING, J.—Our conclusion on the question of whether Kuehnle & Voss were the agents of the Prudential Company in the negotiation of the loan by the Prudential Company to the Argotsingers, and our opinion of the consequences of such conclusion, are controlling, and we proceed immediately to the discussion of that question. The facts should be considered in the light of some elementary principles.

What one may do himself, he may do by another, and what he does by another, he does himself. Agency is a representative relationship.

"The distinguishing features of the agent are his representative character and his derivative authority." Mechem on Agency, Section 1.

See, also, Story on Agency (9th Ed.), Section 3; *Sternaman v. Metropolitan Life Ins. Co.*, 170 N. Y. 13, 21 (62 N. E. 763, 765, 88 Am. St. 625, 57 L. R. A. 318) ; 2 Corpus Juris 421.

"The word 'agent' is a very extensive term, and may be fairly applied to almost anyone who performs the office of another." *Clement v. Canfield*, 28 Vt. 302.

"The relation of agency is the consensual relation existing between two persons, by virtue of which one of them is to act for and in behalf of the other and subject to his control." American Law Institute, Agency, Restatement No. 1 (Tentative), Section 2.

"When the person acting is to represent the other in the contractual negotiations, bargainings, or transactions involved in business dealings with third persons, or is to appear for or represent the other in hearings or proceedings in which he may be interested, he is termed an 'agent,' and the person for whom he is to act is termed the 'principal.'" Idem, Section 3.

"Stipulations in the contract of the parties as to whether a given person is an agent, and if so, whose agent he shall be deemed to be, are not conclusive. Neither is the testimony of the agent or the parties conclusive. * * * (a) Where a person is unquestionably the agent of one party or the other in a transaction, but there is a dispute as to which party is his principal, the

question is to be decided by a reference to all the facts and circumstances of the case. A proper interpretation of the facts may indicate that he was the agent of one party, although the contract recites or he testifies that he was the agent of the other.'' Idem, Section 71.

'' (3) There may be express and formal employment, or employment may be inferred from facts and circumstances, or implied from other employment, under the rules set forth in Sections 43 and 44.'' Idem, Section 72.

The principal and agent may attempt to disguise their real relationship under the form of a contract between them by which the relationship of principal and agent between them is in terms denied, and is asserted to exist between the agent and a third person. They may attempt by their contract to make the agent the agent of another, instead of the actual principal. The court will not permit itself to be deceived, or the actual relationship between the principal and agent to be perverted or the rights of third persons affected by such jugglery of words or make-believe, but will ascertain the facts as they actually are, and on such facts determine the truth and the true relationship as it is in reality. *Trotter v. Grand Lodge,* 132 Iowa 513, 520; *McLean v. Ficke,* 94 Iowa 283, 289; *Donaldson v. Kenegy,* 197 Iowa 893, 898. See *Youtsey v. Union Cent. L. Ins. Co.,* 191 Iowa 1120; *Harrison v. Legore,* 109 Iowa 618.

The Prudential Company has its principal office at Newark, New Jersey. It has been engaged in making loans in Iowa. The extent of such business in Iowa does not appear; but it is a fair inference from the record that an extensive loan business has been transacted by the Prudential Company in Iowa through Shaw & Kuehnle and Kuehnle & Voss. In 1911, Shaw & Kuehnle were asked by the Prudential Company to ''furnish us with an up-to-date list of your local correspondents.'' A list was accordingly furnished, and included names in perhaps 100 or more towns. The Prudential Company thereupon advised Shaw & Kuehnle that ''it has been thought best to give The Leavitt & Johnson Trust Company, of Waterloo, Iowa, the exclusive right to submit applications to us for farm loans upon property in the following counties in Iowa,'' naming some seventy. The company's letter stated:

"As most of this section of the state is somewhat distant from your office you have made a very limited number of loans for us there. We prefer that loans you have already made in this section should remain under your supervision but new applications upon property in the above counties which you wish to submit to us should be referred to The Leavitt and Johnson Trust Company."

Note the language. A loan business of this extent would naturally be expected to have the oversight of some representative or agent of the Prudential Company in the state. On February 14, 1913, Kuehnle & Voss and the Prudential Company made a contract, reciting:

"Whereas the party of the first part desires to submit to the insurance company applications for loans upon the security of mortgages on lands located in the state of Iowa, and the insurance company is willing to receive such applications, and make loans where said applications are approved."

The contract proceeds to declare, in substance, that, where application is made to the company by Kuehnle & Voss, and accepted by the company, the company will deposit to Kuehnle & Voss's credit with Kountze Brothers of New York City, "or in such other depositary as shall be mutually agreed upon, the amounts which may have been advanced by the party of the first part [Kuehnle & Voss] in order to close said loans as soon as the insurance company shall receive, in proper form, notes of the borrowers evidencing such loans, together with the abstracts of record of title and attorney's reports on title forwarded by the party of the first part to the insurance company, together with their certificate of payment of the borrower or borrowers." Kuehnle & Voss agreed to purchase from the insurance company all such loans as to which defects or errors might be discovered, and to pay such amount of any loans that might be found to be in excess of one half of the value of the security.

The Prudential Company insists upon this provision of that contract:

"It is further mutually understood and agreed that in all transactions arising out of the performance of this agreement, the party of the first part is acting and will act as agent of the

borrower in negotiating said loans, and in no instance is acting or shall be authorized to act as agent for the said insurance company.''

A previous similar contract between Shaw & Kuehnle and the Prudential Company was thereby canceled.

On June 19, 1922, an agreement was made, reciting that of February 14, 1913, as one by which the partnership of Kuehnle & Voss ''was appointed the loan correspondent of the Prudential Insurance Company of America with authority to submit applications for and close real estate mortgage loans on lands located in the state of Iowa upon compliance with the conditions'' thereof. This agreement further recited that ''in said agreement it was stipulated that abstracts of the record of title of the borrower should be furnished in each case by said Kuehnle & Voss to the Prudential'' Company; that it had come to the knowledge of the Prudential Company that Kuehnle & Voss had furnished certain abstracts which were incomplete, ''in that there are omissions of records and instruments of record which affect the title to the security;'' and that the Prudential Company had called upon Kuehnle & Voss ''to accept entire responsibility for such incomplete showings of title.'' Kuehnle & Voss agreed to indemnify the Prudential Company accordingly. It is important to notice that the contract of February 14, 1913, was construed as giving Kuehnle & Voss authority,—not authority from borrowers, but authority from the Prudential Company ''to submit applications for and close real estate mortgage loans on lands'' in Iowa. It is important to notice, also, that the contract was construed as stipulating that Kuehnle & Voss should furnish abstracts. It appears that monthly allotments of funds for loans through Kuehnle & Voss were made by the Prudential Company. One of the Prudential Company's letters approving a number of applications says:

''These applications will not be charged in your monthly allotment, but they were approved with the understanding that the loans will be closed at once.''

The Prudential Company at one time paid Kuehnle & Voss one tenth of 1 per cent commission. This practice was discontinued, but when does not appear. On May 22, 1917, the Prudential Company wrote Kuehnle & Voss concerning these com-

missions on "farm loans to be made by this company through your office, you will note that we state that such commission is to be allowed after the interest for the same period has been collected by this company. The quarterly statements which we ask for should, therefore, include loans where interest has been received by this company during the previous three months in each year." On November 15, 1920, the company wrote the Bank of Denison:

"The attention of our finance committee has been called to the fact that some farm loan borrowers have been compelled to pay excessive commission charges for securing loans. We are pleased to advise that no complaints have been made from the territory under the jurisdiction of this office. However, on and after this date, until further notice, we will require a statement from the correspondent submitting an application as to the gross commission charge made by him for securing the loan if closed."

It thus appears that the company supervised and controlled the amount of commission charged. In the later years, the business was handled through the Peters Trust Company, of Omaha. It appears from a letter of March 10, 1921, that the Peters Trust Company drew a commission of 2 per cent, though, on the record, there is no reason to think that Kuehnle & Voss were any less agents of the Prudential Company than the Peters Trust Company. That the company looked to Kuehnle & Voss to protect their interests, and relied upon them; that Kuehnle & Voss undertook such duty, is shown not only by what has been said, but throughout the correspondence. On May 29, 1918, the company, through its assistant solicitor, wrote Kuehnle & Voss in reference to an application for a loan, which stated that the money was to be used to pay for improvements, suggesting "that you send us a letter agreeing to protect us against mechanics' liens in all loans closed by you in which the liens could take precedence over the lien of our mortgage." That Kuehnle & Voss "closed" loans is here again recognized. The company had its inspectors, but it also looked to Kuehnle & Voss to inspect and report. Kuehnle & Voss were instructed to exercise unusual care "in connection with all applications where the loan per acre is in excess of $50, and a copy of your inspector's report should be sent to us with each case of this kind." Also:

"You should send to this office your inspection reports in connection with applications for loans for $10,000 or over, or in cases where the amount of loan is more than $50 per acre. These reports are of considerable value to us * * * we also have to take into consideration reports of our inspectors in connection with land in the neighborhood. * * *"

The company had its solicitors, to examine title, but it also required reports from Kuehnle & Voss. While the correspondence shows a studied effort to avoid the use of the word "agents," as applicable to Kuehnle & Voss, persistent reference is made to "farm loans in territory under your supervision."' Nevertheless, the conception of the company's general solicitor of the actual relationship is revealed when, on July 24, 1913, he wrote Kuehnle & Voss, expressing extreme dissatisfaction "with the way our matters have been handled by you for some time past. The number of cases which we have returned to you for correction are extensive, and the errors which have necessitated this are of such a character as show extreme carelessness. * * * we must insist on a marked improvement being shown at your end of the line or otherwise we shall feel obliged to recommend to our finance committee that we suspend loaning through your agency until matters can be handled in a satisfactory way." On December 15, 1921, the Peters Trust Company wrote Voss in reference to closing loans:

"A matter has come up in connection with your agency, and especially in connection with abstracts issued by Kuehnle & Voss which has very much unsettled us in the office * * * it was found that a large number of transfers, mortgages, assignments, and releases, had been omitted from each of the abstracts in question. We thereupon forwarded the entire matter, both the original and the new abstracts, to the Prudential * * * who instructed us that we should no longer continue to accept abstracts prepared by your company. * * * now that the matter of closing * * * loans is directly before us we deem it inadvisable to delay further in placing the whole situation before you * * *"

On November 25, 1914, the company, returning to Kuehnle & Voss a report on taxes, and requesting a new set, said:

"We desire to have our correspondents investigate each year and satisfy themselves in regard to the payment of all taxes and

assessments * * * You, of course, understand that we shall expect you to fully protect our interests in connection with any delinquents and advise us as soon as each delinquent has been fully paid.''

In another letter:

''If any property is permitted to go to sale, we desire to have tax sale certificate purchased in the name of The Prudential.''

Here again is plainly recognized the duty of Kuehnle & Voss to protect the title of the Prudential. On April 5, 1915, the company wrote Kuehnle & Voss: ''We desire, of course, to retain desirable maturing loans and extend them.'' Inquiries by prospective borrowers were answered, such as in a letter of January 4, 1919, by the company:

''Applications for extension of loans are only considered when presented to us through the office of our regular loan correspondents, and we have referred your letter to Messrs. Kuehnle & Voss.''

Notices of interest coming due given to borrowers stated ''that it should be remitted to Kuehnle & Voss, Denison, Iowa, by bank draft drawn on one of the reserve city banks,'' and:

''When forwarding remittance, send bank draft *directly* to the order of Kuehnle & Voss, Denison, Iowa, and not endorsed to their order. * * * Kindly notify Kuehnle & Voss, Denison, Iowa, promptly of any change in address or ownership.''

It appears that Kuehnle & Voss made reports and remittances accordingly, and the loan papers, when paid in full, were returned to Kuehnle & Voss. On June 7, 1918, Kuehnle & Voss were requested to collect and remit a balance of interest. They were expected to see to the procuring of insurance. On January 24, 1919, the company wrote Kuehnle & Voss, sending them ''18 receipts and 147 uncanceled coupons for interest falling due during the month of March in your territory.'' A form on the letterhead of the Peters Trust Company to be signed by borrowers read:

''Please deliver to my agent, Bank of Denison, Denison,

Iowa, the proceeds of my loan * * * after paying the existing lien * * *."

On this was noted:

"Unless this order is properly signed and returned with the bond, the check for proceeds of the loan will be made payable to the borrower, after payment of any existing liens."

The purpose of this procedure manifestly was to get direct and positive evidence from the borrower of the proper use of the proceeds of the loan. It is evident, also, that the company did what it would be expected to do: see that existing liens were paid, and settle with the borrower for the balance of his loan. These things it did through Kuehnle & Voss.

On December 12, 1913, the company wrote Kuehnle & Voss, complaining of an abstract which failed to show that a mortgage had been released:

"It ought not to be necessary for us to depend on the examination of this office to ascertain whether or not the company's mortgage is the first lien, * * * Had we been as careless in this office in our examination of the title as your examining attorney evidently has been, we certainly would have been subject to very severe criticism."

That the company required opinions, and looked to Kuehnle & Voss for abstracts of titles, furnishing them the forms on which to make them, is clear. On December 23, 1919, notice was given to Kuehnle & Voss that the company expected to "entertain applications for farm loans in territory now under your supervision only when presented to us through No. 511 Farnam Building, Omaha, Nebraska." Deposits of the amount of accepted loans to the credit of Kuehnle & Voss seem to have been made at various places, latterly either Peters Trust Company or the Omaha National Bank. The loan papers were sent to and examined by Omaha attorneys. Kuehnle & Voss were required to pay off prior liens, and to have the borrower's receipt, and the title and papers were approved before any credit was given to Kuehnle & Voss. The Prudential Company did not, in the first instance, advance the money to pay prior liens, but it was advanced by and paid to Kuehnle & Voss in the method mentioned. The borrower paid for the abstracts of title. The loan papers

were kept by the Prudential Company until they received payment. The notes and coupons were not usually sent out for collection, although, as has been seen, there was, apparently at least, one exception to the rule. With the Argotsingers' papers was an abstract of title certified by Kuehnle & Voss, showing release of the plaintiff's mortgage, and the following:

"Borrower's receipt. This is to certify that Kuehnle & Voss have made full settlement with me for the loan I made with The Prudential Insurance Company of America, for Twenty-four Thousand ($24,000)." (Signed by Argotsinger.)

The Omaha National Bank advanced the $24,000, certified thereto to the Prudential Company, and requested remittance. The Argotsinger application stated that the purpose was to pay old loan. The loan was approved, and the amount of it was credited to Kuehnle & Voss, in reliance on the abstract and Argotsinger's receipt.

The Argotsingers received $6,000 of the loan. The $18,000 supposed to have been paid to plaintiff in satisfaction of its mortgage was evidently appropriated by Voss. The Argotsinger application stated that the $18,000 mortgage was held by C. F. Kuehnle. It was in fact made out in the name of Voss. As has been noted, the abstract showed that this mortgage had been released. The apparent release was effected by changing and recording a release of another instrument executed by plaintiff.

The Prudential Company's contention, in substance, here is that the Argotsingers furnished to the Prudential Company an abstract of title which showed the release of the plaintiff's mortgage, and a statement in the application that the mortgage was held by Kuehnle, and a further statement that Kuehnle & Voss had made full settlement for the amount of the loan; that the Argotsingers selected abstracters, and employed Kuehnle & Voss to make the abstract; that the Prudential Company withheld from Kuehnle & Voss the power to act as its agent in disbursing funds; that Kuehnle & Voss were the agents of the Argotsingers, and the Prudential Company relied upon the papers furnished by Argotsingers through their agents, Kuehnle & Voss, and on the statement that the $18,000 mortgage was held by Kuehnle & Voss, and on the receipt and the abstract; and that the Argot-

singers are estopped from asserting that they did not receive the $18,000; that the forgery was perpetrated in the course of Kuehnle & Voss's employment in behalf of the Argotsingers, and was the fraud of the Argotsingers' agent; that the Prudential Company was without fault, and as between it and the Argotsingers, is the innocent party; and that the loss resulted from the act and negligence of the Argotsingers.

There can be no doubt, on this record, that the Prudential Company looked to Kuehnle & Voss to furnish it applications for farm loans; to make them out in accordance with instructions; to prepare abstracts of title; to see that titles were good, and that there were no prior liens, or, if there were such liens, to discharge them; to see that loans were properly closed, and afterwards to guard the company's interests with respect to them. Generally, the Prudential Company confided to Kuehnle & Voss the business of obtaining and looking after and safeguarding its loan business in the territory given to them. Kuehnle & Voss assumed to do this business. Kuehnle & Voss were doing for the Prudential Company business of the company which, if the company had had an office in the territory, it would (in large part at least) have done by its immediate officers and employees. 21 Ruling Case Law 817.

We are of the opinion that, notwithstanding the studied effort of the Prudential Company to disguise the real relationship between it and Kuehnle & Voss, Kuehnle & Voss were its agents. When the Argotsingers made the application for the loan in question, Kuehnle & Voss were agents of the Prudential Company. The Argotsingers approached Kuehnle & Voss, not as their agents, but as the agents of the Prudential Company. Manifestly, the Prudential Company and Kuehnle & Voss could not by their contract bind the Argotsingers to the stipulation that Kuehnle & Voss should act as the agents of the Argotsingers, nor could they, by their verbal assertion that Kuehnle & Voss "in no instance is acting or shall be authorized to act as agent" for the Prudential Company, avoid or evade, as to third persons, the fact of the relationship as it actually was. The Prudential Company employed Kuehnle & Voss. Kuehnle & Voss possessed the blank form of application provided by the Prudential Company, and made it out in pursuance of the Prudential's instructions. Kuehnle & Voss were the agents selected by the Pruden-

tial Company, and were the abstracters selected by it. Kuehnle & Voss were under duty to the Prudential Company, as is manifest from the agreement of February 14, 1913, and its later interpretation, and were liable to the Prudential Company for breach thereof. They represented to their principal, the Prudential Company, that they had advanced payment of the $18,000 mortgage, and they so represented to the Argotsingers, and on that representation procured from Argotsingers the receipt, and on it and on the abstract, procured from the Prudential Company the money for which the Argotsingers' note and mortgage were given. Kuehnle & Voss perpetrated a fraud on the Argotsingers. They violated their duties as agents to the Prudential Company. Kuehnle & Voss knew, when the application was signed, that the $18,000 mortgage was not held by them. When they forwarded the abstract to the Prudential Company, the Prudential Company knew that the mortgage had been assigned to the plaintiff. Kuehnle & Voss knew that the purported release of it was forged. The Prudential Company reposed confidence in Kuehnle & Voss to furnish an honest abstract of title, and receipts from the borrowers honestly obtained. If an entirely forged abstract of title or forged receipt from the borrowers had been furnished, the forgery would be that of those to whom the Prudential Company gave its confidence. The Prudential Company, in accepting the loan, bound itself to pay to or for the Argotsingers the $24,000. The Prudential Company had to pay the $18,000 on the mortgage held by the plaintiff, in order to clear the title. It would not, and did not, depend upon the Argotsingers to do this. The Prudential Company did depend upon Kuehnle & Voss, whose duty to the company it was to pay it. The Prudential Company selected its own agency for the removal of the $18,000 lien, and that agency was its agents, Kuehnle & Voss, and the payment was for it, and a part of the performance of its duty to pay the $24,000. It can make no difference whether they advanced the $18,000 to Kuehnle & Voss for use in making the payment or whether they instructed Kuehnle & Voss to pay it and deduct it from the $24,000 they had to pay. The Prudential Company undertook to pay the $24,000, and in paying it, to have the lien of plaintiff's mortgage discharged, and is responsible to the Argotsingers for the agency which it adopted to that end. The deceit practiced upon the

Prudential Company was the deceit of those whom it had selected, in whom it had reposed confidence, to whom it had directed and authorized borrowers to go, and with whom it had authorized them to deal. The Prudential Company knew that the stipulation in the agreement between it and Kuehnle & Voss that Kuehnle & Voss should act as the borrowers' agent was wholly impotent, and knew that, in fact, Kuehnle & Voss were looking after its interest and acting for it. The responsibility for its misplaced confidence must fall upon the principal, and not upon the parties dealing with the agents.

The Prudential Company complains that it is entitled to judgment in any event for $6,000, with interest, whereas the court rendered judgment for only $5,557.76. If there was an error in computation, it should have been called to the attention of the trial court by motion to correct. Code of 1927, Section 12827. It is the contention of the Argotsingers that they made payments of interest on the entire $24,000, which would result in reducing the balance which the Prudential Company would otherwise be entitled to recover. The Prudential Company furnishes us with no figures or references showing that the computation in the court below is erroneous. The affirmance will be without prejudice to appellant's right to seek correction of the amount of the judgment in the lower court. *Iowa Nat. Bank v. Davis,* 188 Iowa 346.—*Affirmed.*

DE GRAFF, ALBERT, KINDIG, and WAGNER, JJ., concur.