ALPA M. WHITNEY et al., Appellants, v. JAKE KRASNE et al., Appellees.

No. 38887.

MAY 7, 1929.

REHEARING DENIED NOVEMBER 25, 1929.

238

*Morsman & Maxwell* and *Tinley, Mitchell, Ross & Mitchell,*
for appellants.

*John P.* and *Robert B. Organ,* for appellees.

KINDIG, J.—While the record is extensive· and the facts somewhat complicated, yet, in the final analysis, there is but one question to be determined. It is: Did the Robert B. Wallace Company, of Council Bluffs, on April 24, 1923,  have authority to collect for Alpa M. Whitney, Lucy A. Whitney, and Julia A. Wright, the plaintiffs and appellants, two notes, one for $6,000 and the other for $4,000, both previously executed by Jake Krasne, Bailey Krasne, George Krasne, Toba Krasne, and Rose Krasne? On that date, the appellees paid the amount of those two instruments of indebtedness (minus $200) to the Wallace Company, but that institution appropriated the money thus received, and never turned it over to appellants. If such collection authority did not exist, then said notes are not paid, and appellants are entitled to judgment for the full amount thereof, as well as a foreclosure of the real estate mortgages given to secure the same. However, these notes were in fact satisfied (except for the $200) by said payment, provided that the Wallace Company acted within the scope of its agency. This collection power, if any there was, grew out of an agency. That there was such relationship existing between the Whitneys and· the Wallace Company is established beyond any doubt. Controversy arises only concerning the extent thereof.

Appellants contend that the scope of such agency was special and limited to the degree that it did not include the right to make said particular collection at the time named. To the contrary, appellees assert that such agency was general and broad, and therefore actually or apparently included the authorization for making the specific collection. Wherefore, a settlement of the dispute must be found in the facts. A general history of the earlier relationships existing between the Whitneys and the Wallace Company will aid in understanding the later transactions between the appellants and the appellees.

In an early day, William L. Whitney, Sr., acquired considerable property in Council Bluffs. His business was that of

operating a china store. W. L. Whitney, Jr., now deceased, Lucy A. Whitney, appellant, and Julia A. Wright, appellant, were the children of William L. Whitney, Sr. (Alpa N. Whitney, appellant, is the surviving widow of W. L. Whitney, Jr.). These children, with the exception of Lucy, lived in Council Bluffs with W. L. Whitney, Sr., until 1881, when they left that city, and returned to Massachusetts. During his absence from Iowa, however, William L. Whitney, Sr., retained the aforesaid property in Council Bluffs, and managed it until his death, in 1900. Through that death, the said property was inherited by W. L. Whitney, Jr., and the appellants' Lucy A. Whitney and Julia A. Wright. So, from 1900 until the death of W. L. Whitney, Jr., the realty was held in common by those three children of W. L. Whitney, Sr. From 1881 until the time of the present litigation, the Council Bluffs property was managed by an Iowa agent. At first, this representative was N. P. Dodge & Company. Succeeding that institution, the affairs were turned over to The Dodge-Wallace Company, which, in later years, adopted the name of The Robert B. Wallace Company, aforesaid. Julia A. Wright, appellant, resides in Montpelier, Vermont; Lucy A. Whitney lives in Arlington Heights, Massachusetts; while W. L. Whitney, Jr., until his death, resided, and Alpa M. Whitney, his wife, the appellant, now resides, in Newton, Massachusetts. As all these owners lived in a far distant state, they did not visit Iowa, and left their Council Bluffs holdings entirely in the management of their agents just designated.

Upon the death of his father, W. L. Whitney, Jr., was empowered by his two sisters to manage and control the Iowa possessions; and thus armed with authority, he continued operating through the above-mentioned agency in Council Bluffs, as his father had done. Hence, under the power thus received from the eastern owners, the Robert B. Wallace Company, in Iowa, as agent, transacted all of its principals' business here. Among the duties thus performed and powers thus exercised by such agent were the following: The renting of various parcels of real estate; the collection of rents; supervision of repairs and alterations; the payment of repairs; payment of taxes; and insurance of the property. Embraced within those activities of the agent's were fixing the rentals, canceling leases, determining the necessity of minor, and sometimes extensive, repairs, supervising im-

provements or alterations, procuring rebates on premiums, adjusting insurance losses, and generally looking after the property aforesaid. Accounting apparently was made by the agent to its principals every quarter. All sums collected were apparently placed in the personal account of the agent, and transmitted to the principals therefrom. No other agent represented these principals in Council Bluffs.

The value of this Iowa property in 1917 was approximately $100,000. Those Whitney heirs were becoming older, and it seems they desired to dispose of their various real estate holdings, in order that they might have liquid assets in lieu thereof. Therefore, in 1917, they sold their New England property, and sought to dispose of that in Iowa as well. When doing this, W. L. Whitney, acting for his sisters and himself, extended the previous scope of the Robert B. Wallace Company's agency, and asked the latter to find purchasers for the various parcels of real estate. Immediately the said agent commenced to do so, and from time to time, contracts were made between the Whitneys and the respective purchasers. Of course, in each instance, the final proposition was accepted or rejected by W. L. Whitney, Jr., for the Whitneys. Yet all the negotiations and details were carried out by the agent. Moreover, all matters relating to the collection of the initial and deferred payments were managed exclusively by the agent, the same as previous collections of rents and other items had been handled.

Finally, the sale of the property covered by the mortgages now in litigation was very much desired by the appellants. Inquiry was made by the Forrest Smith Company, of Council Bluffs, in reference to a prospective lease thereof. W. L. Whitney replied that he was not interested, but informed the Wallace Company concerning the affair, and wondered if it were not interested. Again the Smith Company wrote to W. L. Whitney, offering $56,000 for this realty. Rejection thereof was made by W. L. Whitney, although he did desire to sell; and once more the Smith Company letter was sent to the agent, Wallace Company. Still the Smith Company persisted, and again asked W. L. Whitney to name a price on this real estate. Once more W. L. Whitney sent the letter to the Wallace Company, and refused the Smith Company by a letter reading as follows: "* * * Robert B. Wallace Company is our agent for all our property in Coun-

cil Bluffs. We decline to make any offer except through them.'' Then the Wallace Company interested appellees in the purchase of these premises. Originally, appellees signed a written offer in January, 1921, to buy the property for $55,000, of which $25,000 was to be in cash, and the balance in deferred payments, secured by a mortgage thereon, payable in 10 annual installments of $3,000 each. With that proposal, the appellees placed $2,500 earnest money in the possession of the Wallace Company. Refusal of this offer was made by W. L. Whitney, Jr. Further negotiations were had, and Wallace went back east, to consult with W. L. Whitney, Jr.

After that, in April, 1921, appellees made another proposition to buy this real estate for $56,500, of which $26,500 was to be cash; and it was contemplated that the balance be carried for 3 years, at 6 per cent interest, payable $10,000 per annum. Each annual deferred payment, it was arranged, should be evidenced by two notes: one for $6,000, and the other for $4,000. Also, this time the deposit was increased from $2,500 to $5,000. W. L. Whitney, Jr., accepted the offer, and the Wallace Company, as agent, carried out the details of the transaction. Consummation of the deal was made on July 18, 1921, when the appellees paid to the Wallace Company, as agent for the Whitneys, $21,500, which, together with the $5,000 down payment, made a total of $26,500. Simultaneously with making that payment, appellees executed purchase-money notes and mortgages for the $30,000 balance. These notes were made payable to the order of, and the grantee in each of the mortgages was, the Wallace Company. Resultantly, a deed from the Whitneys was delivered to appellees, and they, in turn, handed over to the Wallace Company said notes and mortgages. Some delay occurred in completing the title, and apparently the Wallace Company used this as an excuse to hold the money in its own account, and thereby the Whitneys were deceived. Nevertheless, the Wallace Company accounted for all of this money, with interest, in the early part of 1922. Apparently the Whitneys were anxious to sell appellees' notes, and accordingly asked the Wallace Company to thus accommodate them. For a time, therefore, the notes and mortgages were kept in the possession of the Wallace Company, and the assignments of the mortgages were never recorded until after April 24, 1923, when the disputed payment was made which is

the subject of this litigation. It seems that W. L. Whitney desired a sale of appellees' notes, and the Wallace Company was attempting to carry out the wishes of its principals. Early in 1922, all of appellees' notes were indorsed to the order of W. L. Whitney, Jr., and mailed to him, together with the mortgages and assignments thereof; but, as before said, the assignments were not recorded until the late date aforesaid. Interest was collected by the Wallace Company on appellees' notes for January, 1922, and remittance thereof was made to the Whitneys.

On June 15th of that year, W. L. Whitney, Jr., mailed to the Wallace Company, for collection, the $6,000 and $4,000 notes maturing on July 18th. Before the maturity date, however, Mr. Wallace, on June 20th, went to the appellees' place of business, and suggested immediate payment, in consideration of $100 discount. Accordingly, 30 days before the maturity date, appellees paid the Wallace Company the amount of the principal and interest on the two notes, minus $100. (Parenthetically, it is here noted that all these notes were payable "on or before"). Upon such payment, the notes were surrendered by the Wallace Company to the appellees. Each instrument bore the indorsement of W. L. Whitney, Jr., which had been canceled by the use of ink lines. Evidently the Wallace Company kept this principal and interest for a long time, and during that period pretended to the Whitneys that appellees had not paid. Subsequently, on September 1, 1922, the Wallace Company wrote W. L. Whitney, Jr., inclosing a check for the interest, saying that the principal would be paid in a few days. Later, on October 9th of that year, the Wallace Company mailed the Whitneys a check for the $4,000 note and interest.

More delay then occurred concerning the principal on the $6,000 note which had been paid by the appellees, and various methods of "stalling" were used by the Wallace Company. Not until January 3, 1923, did the Wallace Company finally send the Whitneys the proceeds of the $6,000 note aforesaid, together with the interest thereon. Extra interest on these delayed remittances was paid by the Wallace Company. As a result thereof, the Whitneys did not know that their agent was holding for its own use the payments made by the appellees. Late in the year 1922, W. L. Whitney, Jr., died testate, and his wife, Alpa M. Whitney, an appellant herein, was the sole devisee under the

will. L. N. Whitney, the son of Alpa M. Whitney and W. L. Whitney, Jr., succeeded to the position of his father in the management of the Whitney interests.

Many years before the death of his father, W. L. Whitney, Jr., the son, L. N. Whitney, lived at the paternal home, and advised with his parents concerning the business. Under the record, L. N. Whitney had the same authority and duties to perform in reference to the Whitney property as did his father, W. L. Whitney, Jr. Notation should be made of the fact that the last $6,000 and interest of appellees' notes, maturing in 1922, were remitted by the Wallace Company after the death of W. L. Whitney, Jr., and during the management of L. N. Whitney. The latter continued the Wallace Company as the Whitney agent at Council Bluffs.

Collection was made by the Wallace Company of the semi-annual interest on appellees' remaining notes, in January, 1923, and remittance thereof to the Whitneys was made. Then, on April 24, 1923, Wallace went to the appellees, and suggested that they at once pay the $6,000 and $4,000 notes due on July 18th, with an interest discount of $200. This appealed to the appellees, and they made payment accordingly. Wallace told them that the notes were at his office; but, as a matter of fact, they were in the possession of the Whitneys, in Boston. No remittance to the Whitneys was ever made by Wallace or the Wallace Company of this last-named collection. A receipt, however, was given by the Wallace Company to appellees. Without knowing of the aforesaid payment, on July 10, 1923, L. N. Whitney mailed to the Wallace Company the two notes thus paid by appellees, with instructions to collect. These notes were received by the Wallace Company in due time, and immediately surrendered to the appellees, because they had been previously paid, as before explained. Various methods were again utilized by the Wallace Company to evade the facts, so that the Whitneys would not know that the collection had been made. There was correspondence concerning discounts, etc. Appellees, of course, did not know anything about the Wallace embezzlement.

Finally, on August 29, 1923, Robert B. Wallace, president of the Wallace Company, took his own life, and immediately following the suicide, the Wallace Company went into bankruptcy. Thus the Whitneys lost approximately $10,000 paid by appellees

to the Wallace Company, as before described. Wherefore, this suit was instituted, for the purpose of obtaining judgment, on the theory that those two notes had never been paid.

Dispute does not arise concerning the notes due in 1924, because appellees have paid the amount thereof into court. Principally, then, as originally stated, the disagreement arises over the authority of the Wallace Company to receive from appellees the $10,000 on April 24, 1923.

I. Appellants, at the outset, argue that the Wallace Company was only a special and limited agency, with authority to collect rents, supervise certain repairs, and procure insurance. Concerning the sale of real estate, appellants say the Wallace Company was a mere broker, and had no other or different authority. Furthermore, it is contended by the appellants that the only right the Wallace Company had to collect appellees' notes was as and when directed so to do by the Whitneys, and that the latter never authorized the Wallace Company to receive payment on any of these notes until the instrument affected was forwarded from Massachusetts to Council Bluffs for that purpose. Also, it is insisted by appellants that in no event could the Wallace Company have authority to discount.

At the time appellees paid the Wallace Company the money in question, the notes, as before said, were in the possession of the Whitneys, and the due date had not yet arrived. Therefore it is concluded by appellants that the Wallace Company, although their agent for limited purposes, was not empowered to accept the particular money at the time and in the way actually done. Reliance is made by them upon *Hakes v. Myrick,* 69 Iowa 189, and *Draper v. Rice,* 56 Iowa 114. In the *Hakes* case, supra, the agent was vested with general power to manage the principal's real estate. Sale thereof was made, and a mortgage taken back to secure a note for certain deferred payments of the purchase money. Both the note and mortgage were left in the agent's hands for collection. Instead of collecting, as authorized, the agent exchanged the secured note for an unsecured one, and released the mortgage, without special authority so to do. Therefore, we said:

"When the note and mortgage which were given for a portion of the purchase price were placed in his [the agent's] hands,

he was empowered to do but a single act with reference to them, viz., to receive and transmit to plaintiff the money due thereon whenever it should be paid. But this act in no manner pertained to his general agency [management of the principal's property]. It did not relate to his general employment.''

Because thereof, it was held that the agent did not have authority to exchange the secured for an unsecured instrument.

*Draper v. Rice,* supra, involves a situation where the agent had authority to sell his principal's property and take a note therefor; but we said that this in itself did not give the agent the right to receive payment of the note after it had been delivered to the principal. Those authorities thus relied upon by appellants are not in point. See, also, *Huismann v. Althoff,* 202 Iowa 70. Here, the Wallace Company did have authority to receive payment on any collectible indebtedness of the Whitneys in Council Bluffs. The whole record supports that pronouncement. Forsooth, the Whitneys had no other agent to do so, and relied entirely upon the Wallace Company to receive and remit all payments. From the time the first parcel of real estate was sold, in the year 1917, until Wallace killed himself, and his company went into bankruptcy, the Whitneys were constantly asking that cash be received on the various outstanding contracts and notes. As found by the trial court, not only in the case of appellees, but in other instances, on different contracts, the Wallace Company collected for the Whitneys before the indebtednesses were due, and when the instruments evidencing the same were not in Council Bluffs, but in the east. Examples of this are the Braunstein and Pace transactions. Explanation is made by appellants that there was special authority relating to these specific items: for instance, in one case the Whitneys sent their duplicate contract, and in the other, they wrote a letter suggesting the anticipation of payment. However, throughout all the transactions in reference to these sales, the Whitneys were endeavoring to obtain cash, and repeatedly they insisted that their agent, the Wallace Company, sell the notes, or otherwise procure the cash, in order that the various properties in Council Bluffs could be finally converted into money. Obviously that was a fixed policy of the Whitneys', adopted, no doubt, because the owners were

becoming aged, and they did not desire to be troubled with the management of unliquidated property.

Without repeating, reference is again made to the broad scope of the Wallace agency's authority, previously set forth in this opinion. When selling the Whitney properties, the Wallace Company did everything except fix the terms of the sale. Usually, in so doing, it took the notes and mortgages in its own name. Always it collected the cash payments. All transfers were completed by the agent, even to the extent of assigning leases, transferring insurance, canceling it, and procuring rebates. Proofs of loss for insurance were made by the agent. It adjusted controversies with tenants. Attempt is not here made to set out all the facts and circumstances showing the broad scope of the authority possessed by the Wallace Company. Yet it should be noted that the Whitneys, while they were principals, permitted appellees to make their notes payable at Council Bluffs, to the agent, Wallace Company. By their conduct in the manner and way before indicated, appellants led appellees to believe that the Wallace Company had authority to receive all payable sums, if not anticipated amounts.

Upon appellees rested the burden of proving the agency. *Boylan v. Workman*, 206 Iowa 469; *Carr v. Benjamin*, 207 Iowa 1139. Manifestly, that burden of proof was fully met by appellees. Within *Boylan v. Workman* is the following language:

"* * * it is * * * a well established rule that, as between a principal and third parties, the principal is bound by acts of the agent within the limits of the *apparent* authority of the agent. * * * The inquiry of a stranger in dealing with an agent must be to ascertain whether or not such person is an agent, and in general, the character of that agency; but when that has been ascertained, not by what the alleged agent may say or do, but by what the principal has done, then the stranger has a right to rely thereon. And even though the agent, in such event, be a special one, yet the stranger has a right to rely upon that person's having such authority under the special agency as the principal has 'apparently' given him.''

See, also, *Burlington Sav. Bank v. Prudential Ins. Co.*, 206 Iowa 475; *Burlington Sav. Bank v. Prudential Ins. Co.*, 207 Iowa 808; *McCormick Harv. Mach. Co. v. Lambert*, 120 Iowa 181;

*Fritz v. Chicago Grain & Elev. Co.,* 136 Iowa 699; *Donaldson v. Kenegy,* 197 Iowa 893; *Sioux City Cattle Loan Co. v. Lovrien,* 198 Iowa 296.

Beyond a peradventure of a doubt, the Wallace Company had the power to collect for the Whitneys any moneys payable to them in Council Bluffs at the time in question. Consequently, there was authority in the Wallace Company to receive from appellees the money paid it on the two notes in litigation. They were due, it is true, on July 18, 1923, but they were each payable "on or before" that date. The fact that Wallace suggested the early payment does not change the provisions of the note, giving appellees the right to pay "on or before." Resultantly, when appellees paid the money aforesaid to the Wallace Company, the latter had authority, as the agent of appellants, to receive the same, and, to the extent of the payment made, the debt was satisfied. That $200 deduction, however, was not authorized, and appellees, as found by the district court, are liable to appellants for it.

II. Notwithstanding the above and foregoing, appellants assert that appellees at their peril paid the Wallace Company, because the latter did not have the notes in its possession at the  time the money was delivered. Authority for that theory, they say, is found in *Ritter v. Plumb,* 203 Iowa 1001; *Shoemaker v. Minkler,* 202 Iowa 942; *Franklin Sav. Bank v. Colby,* 105 Iowa 424; *Carr v. Benjamin,* supra; *Iowa L. & Tr. Co. v. Seaman,* 203 Iowa 310.

Of course, each case must be decided upon its own facts. If, at the time in question, the Wallace Company was the agent of the Whitneys for the purpose of receiving the payment, then appellees' debt has been satisfied. Payment by the maker to one who does not have in his possession the notes collected would not, in and of itself, cast liability upon the former. Although appellees, in such event, acted at their peril, they nevertheless are safe if they can prove that the Wallace Company was in fact the authorized agent of the Whitneys. *Carr v. Benjamin,* supra; *Bissell v. Spring,* 179 Iowa 1005; *Iowa L. & Tr. Co. v. Seaman,* supra; *McCullough v. Reynolds,* 181 Iowa 1089; *Harrison v. Legore,* 109 Iowa 618. Thus it was said in *Carr v. Benjamin,* supra:

"The general rule recognized by this and all courts is that one who pays a mortgage and note, without knowing that the person to whom he pays has the possession of the same, pays at his peril; but the force and effect of this rule do not, however, conflict with another rule of this court, which has been repeatedly pronounced, which is that, if the payer is able to prove that the person to whom he made payment is the accredited agent of the holder, with power to receive such payments, then the holder is bound by payments so made; and here the burden of proof is upon the one making the payments."

Clearly, then, the mere fact that the Wallace Company did not have in its possession the notes does not alone make appellees liable to the appellants. While, in such event, appellees paid at their peril, yet, if they proved, as they did, that the Wallace Company was appellants' authorized agent for the purposes of the collection, then their debt was satisfied. It was perilous to thus pay, but not necessarily fatal.

III. Continuing their objections regarding the Wallace Company's authority to accept said payments from appellees, appellants maintain that the mere payability at the Wallace Company office did not make such business concern an agency for the receipt of the money.

Were there nothing else to show the agency, appellants would be correct in their contention. *Huismann v. Althoff*, supra; *Keene Five Cents Sav. Bank v. Archer*, 109 Iowa 419; *Bank of Montreal v. Ingerson*, 105 Iowa 349.  But, as before stated, the record discloses an abundance of evidence to show the agent's authority to make said collection, without considering the fact merely that the note was payable at the Wallace Company office. To avoid repetition, reference is made to the previous discussion.

IV. Nevertheless, appellants urge that the Wallace Company could not have been the agent of the Whitneys when these particular notes were paid, because any such relationship of that nature which may have existed during the lifetime of W. L. Whitney, Jr., terminated upon his death, and was never again renewed by L. N. Whitney.

Death of the principal, generally speaking, will terminate

an agency. *Huismann v. Althoff,* supra; *Furenes v. Eide,* 109 Iowa 511. Argument is here made by appellants, on the one hand, that the Wallace Company was merely the subagent of W. L. Whitney, Jr.; while, on the other, appellees insist that such agency was directly with Julia A. Wright, Lucy A. Whitney, and W. L. Whitney, Jr. As to which it was, we do not decide; yet the agency aforesaid, existing during the lifetime of W. L. Whitney, Jr., so far as the surviving principals were concerned, was continued after his death; or, as the case may be, the new principals entered into a subsequent agency similar to the old. Under the record, the interested parties, Lucy A. Whitney and Julia A. Wright, empowered their nephew, L. N. Whitney, as they had their brother, W. L. Whitney, Jr., to entirely manage their affairs in Council Bluffs. Alpa M. Whitney, appellant, who succeeded to the rights of W. L. Whitney, Jr., deceased, through the will, also bestowed upon L. N. Whitney full authority in the premises. L. N. Whitney understood the relationship existing between his people and the Wallace Company, and by his every act and word continued it as before.

V. Part of the trial court's judgment and decree was an allowance to appellants of the $200 alleged discount, on the theory that the agent had no authority to grant appellees that

 advantage. An additional $200 is due then, appellants claim, because, through the accelerating clause in the mortgages, the $10,000 due in July, 1923, which, together with 6 per cent interest, was paid into court in the manner and way before stated, in fact bore 8 per cent interest. Necessarily, then, they say, the amount of interest was not $600, as paid, but $800. So $200 is still due thereon.

Due to the commotion caused by the death of Wallace and the bankruptcy of his company, appellees did not pay to appellants the $200 allowed by Wallace as a discount, or the accrued interest on the $10,000 due July 18, 1923. Therefore, under the acceleration clause, appellants had a right to commence foreclosure, and, at their option, declare the entire amount due, and thereby automatically set into operation the 8 per cent provision of the mortgage. *Collins v. Nagel,* 200 Iowa 562. Therein we said:

"The mortgage indebtedness did not become absolutely due by reason of a default on the part of the debtor to pay an interest installment, but it did give the right or option to the plaintiff to commence an action to recover the entire amount of principal and interest. *Watts v. Creighton*, 85 Iowa 154. Plaintiff could waive the default for that year, had he seen fit so to do. *Jones v. DeMoss*, 151 Iowa 112. The right in plaintiff is a permissive right."

Action to foreclose in the present proceeding was commenced on February 23, 1924, and from that date appellants are entitled to interest at the rate of 8 per cent per annum on the $10,000 which was due in July, 1923. That interest is to be granted appellants, in addition to the $200 judgment for the purported discount.

As thus modified, the judgment and decree of the district court should be, and hereby is, affirmed.—*Modified and affirmed.*

ALBERT, C. J., and EVANS, MORLING, WAGNER, and GRIMM, JJ., concur.